Brent H. Blakely (SBN 157292)
bblakely@blakelylawgroup.com
Jamie Fountain (SBN 316567)
jfountain@blakelylawgroup.com
BLAKELY LAW GROUP
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Facsimile: (310) 546-7401
**Attorneys for Plaintiff**
**Deckers Outdoor Corporation**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DECKERS OUTDOOR CORPORATION, a Delaware Corporation,

Plaintiff,

v.

WALMART, INC., a Delaware Corporation; and DOES 1-10, inclusive,

Defendants,

Defendants.

Case No. 2:20-cv-09521-FLA-E

**DECLARATION OF CAROLINE DE BAERE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Hon. Fernando L. Aenlle-Rocha**

## DECLARATION OF CAROLINE DE BAERE

I, Caroline de Baere, declare as follows:

1.  I have been retained by counsel for Plaintiff Deckers Outdoor Corporation ("Deckers" or "Plaintiff") to testify as a footwear expert witness in the above captioned civil action (the "Action"). I submit this Declaration in support of Plaintiff's opposition to Defendant Walmart Inc.'s ("Defendant" or "Walmart") Motion for Summary Judgement.

2.  On February 11, 2022, I submitted an expert report in this action ("Report"). A true and correct copy of my report is attached hereto as **Exhibit 1**.

3.  I reserve the right to modify and supplement my analysis and conclusions set forth in this Declaration based upon any additional fact discovery performed by the Parties or in response to any reports by prepared by other experts in this Action.  I also reserve the right to modify and supplement my analysis and conclusions set forth in this Declaration based upon any changes to any of the applicable legal standards explained to me by counsel for Deckers.

4.  In addition to the documents and information cited in this Declaration, at trial I may rely on other evidence cited in any supplemental or amended reports I submit, as well as visual aids to demonstrate certain aspects of my opinions or the material in this report, which may include demonstratives that I have yet to create.  I will select the specific exhibits that I will use at trial by the due date in the trial schedule provided to me by Deckers' counsel.

5.  I make this declaration based on my personal knowledge, my background, experience, and education; and the publications, reports, studies, documents, interviews, and other materials and information listed in my Declaration.  If called to testify at trial, I would testify competently regarding the opinions and conclusions I have formed in this case.

## PROFESSIONAL AND EDUCATIONAL BACKGROUND

6. I am a thirty-five (35) year footwear industry veteran with over twenty (20) years of experience as an independent consultant with proficiency in design, product development, costing, analysis, merchandising, product planning, vendor sourcing, and strategic sales management. Well-recognized women's, men's, and children's brands I have worked with include Sperry Top-Sider, Keen, Birkenstock, Ariat International, Teva, Red Wing, pediped, Umi Children's Shoes, Livie & Luca, Uniform Advantage and many more.

7. My footwear experience also includes fifteen (15) years working in a corporate environment as Director of Product Development for globally known brands such as Esprit, LA Gear and Ariat International. I also held the strategic role of Vice President for a global footwear start up for three (3) years, managing product development, merchandising, operations, production buying and planning and strategic sales management.

8. During my over thirty-five (35) year career in footwear I have had the opportunity to work with retailers, marketing agencies, tanneries, vendors, sample rooms, and factories and materials suppliers, travelling throughout the United States, China, Mexico, Brazil, France, Spain, Italy, Germany, Indonesia, and Vietnam, sitting side by side with colleagues and industry veterans to design, develop, source, merchandise and purchase seasonal product collections.

9. In February 2005, I was interviewed about my experience in footwear design and my long career within the industry. The article, "On My Own," appeared in a major footwear industry trade publication called Footwear News. I was interviewed in March 2019 by Hidenet.com, a leather industry publication for their "This Week in Leather" feature well as Sourcing Journal for their 2019 industry report on Sustainability and Transparency in footwear manufacturing.

10. Since January 2000, I have owned and operated my own footwear industry consulting business. I provide business management consulting for footwear

companies ranging from startups to fortune 500 companies.  As part of my expertise, I specialize in issues of footwear design, development, merchandising, operations, costing, branding, marketing, sourcing, and selling strategies.

11. My experience also includes over thirty-five (35) years collaborating with marketing teams to provide direct review and decisions relevant to managing catalog content, product merchandising and descriptions, as well as executing the selection of imagery used for strategic marketplace campaigns.  My broad range of expertise also incorporates providing strategic design, merchandising and product planning and development services to footwear brands across all phases of the process, from initial trend research, initiating and creating marketing product briefs to inspire design, through product concepts, managing sales teams, and finally, to final market placement and retail merchandising.  Some of the brands I have done this work for include Livie & Luca, Birkenstock, Ariat International, Umi Children's Shoes, Plae, Red Wing, Uniform Advantage and Sperry Top-Sider.

12. I am currently an Adjunct Professor of Footwear Design at the California College of the Arts in San Francisco, teaching footwear design to University Junior and Seniors where I have the opportunity to impart my over thirty-five (35) years of knowledge to Industrial Design and Fashion Design students.  I also manage the student internship program for the Industrial Design Juniors and Seniors, advising and preparing them to receive practical industry experience.

13.  I was recently invited through Yellowbrick, an online teaching platform specializing in education and career exploration in the Arts, Media, Sports and Entertainment Industries, to provide a series of guest lectures on sustainability, local manufacturing, intellectual property, job interview preparation and footwear design terminology to students as part of their Spring / Summer 2022 curriculum.

14. In late 2018, I co-founded a sustainably sourced and manufactured women's fashion footwear and accessory brand, suggies by Ashbury Skies.  The footwear is produced with a vision of reducing carbon emissions and manufactured locally in my

home state of California.  My responsibilities include all design, merchandising, material and component sourcing and cost negotiations for the brand.  This new collection focuses on local ethically manufactured and sustainable sourcing practices to reverse the negative effects of climate change.

15. I have authored several short articles on sustainable footwear and local manufacturing in the past ten years.  My experience recently includes speaking engagements from 2019 through the present as a panelist, presenter, moderator and interviewee at conferences as well as podcasts, such as San Francisco Sustainable Fashion Week International, FDRA (Footwear Distributor & Retailers of America) Footwear Design Summit, Sourcing at MAGIC, Product Innovation Apparel Los Angeles & New York, FDRA Shoe Sustainability Week and Footwear Design Summits in Dongguan, China and New York, Fashion Institute of Technology New York and Academy of Art San Francisco.  These engagements cover all business facets of the footwear and fashion industry, design, teaching, reducing carbon emissions and sustainability in design and local manufacturing.

16. I have a degree in International Business from Sacramento State University and studied design at the Academy of Art in San Francisco, California.

17. I am an active member of several footwear organizations including TWO-TEN Footwear Foundation and Women in Footwear Industry (WIFI).  As I have done for several years, I am currently mentoring a young woman in the footwear industry through a program developed by WIFI.

18. I am the named inventor in four equestrian boot design patents for footwear: US D785,308 (ornamental design for a boot with notch); US D767,264 (ornamental design for a footwear outsole); US D741,056 (ornamental design for a footwear outsole); and US D398,438 (ornamental design for a boot with zipper).

## BRIEF SUMMARY OF MY EXPERT OPINIONS

Opinion on Trade Dress

19. Based on the materials I have reviewed, including the Rebuttal Report of Lenny Holden and the Defendant's Motion for Summary Judgment, the frameworks and models I have applied, my extensive expertise in the fields of footwear branding and marketing, and my in-depth analyses, I am confirming my previous opinion from the de Baere Report dated February 11, 2022 where I provided extended detail and specific data in support of my analysis where I have formed the following opinions regarding Walmart's allegations that Deckers has failed to establish Trade Dress on the UGG® Fluff Yeah Slide as well as infringement of the '941 Patent:

a.      The Fluff Yeah Trade Dress is non-functional because the collection of features in the Fluff Yeah Trade Dress does not provide a utilitarian advantage over other slide designs in the market. Footwear that embodies the elements of the Fluff Yeah Trade Dress, *i.e.*, the UGG® Fluff Yeah Slide do not have utilitarian functions that "work better" than slides that do not include such elements. For example, the combined elements of the Fluff Yeah Trade Dress do not make the slide more durable, flexible, or stable. Nor do they provide any "performance" benefits, such as using a specific sole design might provide for an athletic shoe or cleats that enhances performance on a soccer shoe. that many design alternatives exists to the Fluff Yeah Trade Dress. For example, the heel strap has a multitude of options to fasten to the vamp, including a heel strap that wraps around the ankle, double heel straps, and heel straps that fasten to the sole of the shoe instead of the vamp, to name a few. Additionally, the width, texture, material used, stretch or static, and edging detail of the strap can be modified based on the designer's discretion. Another element is whether a pattern design or logo is applied to the strap design and shape. A footwear designer also has many options in designing the vamp itself. This includes things like a closed toe vamp, a two-piece vamp, an asymmetrical vamp or overlapping vamp pieces.

b.     The Fluff Yeah Trade Dress is distinctive and has acquired secondary meaning due to Deckers' consistent and exclusive use of the same source-identifying features such as the platform, sling back slide with a furry footbed and midsole perimeter, wide vamp, open toe, and logo elastic strap around the back.  Additionally, the amount of money Deckers has spent in promoting and advertising the UGG® Fluff Yeah Slide, the nature of such advertisements, the commercial success of the UGG® Fluff Yeah Slide, and the unsolicited media and public attention enjoyed by the UGG® Fluff Yeah Slide such as celebrities photographed in the product also demonstrates that it has acquired secondary meaning.

c.     Walmart's Kendall + Kylie Shani Slipper is likely to cause consumer confusion with the UGG® Fluff Yeah Slide because the Kendall + Kylie Shani Slipper is strikingly similar to the design of the UGG® Fluff Yeah Slide, and Walmart markets and sells the Kendall + Kylie Shani Slipper to the same customer base as the UGG® Fluff Yeah Slide.

d.     The UGG® Fluff Yeah Slide is a commercial embodiment of the '941 Patent; that is, an ordinary observer would find the design claimed in the '941 Patent and the UGG® Fluff Yeah Slide to be substantially the same.  Further, an ordinary observer would find the design claimed in the '941 Patent and the Kendall + Kylie Shani Slipper are substantially the same.  Both feature similar clearly defined multiple vamp lines, a slingback strap that wraps around the heel, and feature textured material.

e.     Walmart's actions have harmed Deckers' UGG® brand far beyond lost sales; it threatens the strength and health of Deckers' valuable brands.  Walmart's continued sale of the Accused Products threatens an image that has been so carefully cultivated in many ways, and it

1    jeopardizes Deckers' significant investment of resources in developing

2    these brands. Walmart's activities frustrate Deckers' brands' association

3    with quality.  But perhaps most importantly, Walmart's continued

4    infringement simply takes the control of this valuable brand  out of

5    Deckers' hands, denying Deckers' ability to carefully sculpt the UGG®

6    brand images into brands consumers identify with and admire.

7    Opinion on Validity and Infringement of the '941 Patent

8        20. The validity of a patent may be challenged for various reasons, such as

9    obviousness, anticipation, or inequitable conduct, all of which I understand must be

10   raised as affirmative defenses.  I am not aware of Walmart raising any affirmative

11   defenses in this case for patent invalidity until Walmart raised the defense of

12   obviousness in its Motion for Summary Judgment.  I have read Mr. Holden's Initial

13   Report and his Rebuttal Report, and he does not mention or offer an expert opinion on

14   the affirmative defenses of anticipation, obviousness, or inequitable conduct in either

15   report.

16       21.  Because Walmart never raised the issue of obviousness, either as an

17   affirmative defense in its Answer or in the initial Holden report, I did not prepare an

18   initial or rebuttal report on this issue as patents issued by the United States Patent and

19   Trademark Office (USPTO) are presumptively valid.  I understand from counsel that

20   the first time Walmart raised the affirmative defense of obviousness was in connection

21   with its Motion for Summary Judgment which was filed on February 22, 2022.

22       22. I am typically retained near the beginning of a lawsuit when a plaintiff or

23   defendant raises patent invalidity as an affirmative defense.  As typical timing would

24   dictate in a case such as this, I provide input concerning discovery and have sufficient

25   time to conduct my own research and analysis in order to prepare my expert opinion,

26   which is based on over three decades of experience in the footwear industry.  The time

27   between my initial retention, a possible Markman hearing, and the filing of an expert

28   report can be, and usually is, several months, if not more.  The typical timeframe did

DECLARATION OF CAROLINE DE BAERE

not occur in this case.  Given such incredibly short notice, I am unable to prepare a report, and have not been requested to do so by counsel, or otherwise render an opinion as it relates the issue of obviousness; specifically, whether the '941 Patent would be obvious under prior art.

23. Page 2, Paragraph 4.2 of the Holden Declaration states that my Initial Report dated February 11, 2022 does not reference or acknowledge the Initial Holden Report dated February 10, 2022, although the Holden Report was allegedly provided to Plaintiff long before the preparation and submission of my Initial Report.  This statement is utterly false and has no merit.  Similar incorrect statements regarding my lack of review and acknowledgement of the Alleged Prior Art are repeated multiple times (Page 11, Paragraph 7.1, Page 13, Paragraph 7.3, and Page 2, Paragraph 4.2) throughout his Rebuttal Report from February 24, 2022.  I did not see the Initial Holden Report until late the evening of February 11th, after my report was signed and submitted to Defendant's counsel.  My analysis and Initial Report were prepared during and submitted during the same timeframe as the Initial Holden Report.  As discussed above, the Holden report made no mention to the affirmative defense of obviousness, or any other affirmative defense (e.g., anticipation, inequitable conduct).

## **BACKGROUND**

24.  I am familiar with the U.S. Patent and Trademark Office ("USPTO") guidelines regarding design patents.  These guidelines require that every design patent application must include a drawing that constitutes the entire visual disclosure of the claim and that nothing regarding the design sought to be patented is left to conjecture. The drawings must include a sufficient number of views to constitute a complete disclosure of the appearance of the design claimed.

25. A U.S. design patent protects the ornamental design for an article of manufacture.  A design patent may protect the overall configuration or shape of an

article of manufacture, or an ornamental design applied to an article, or a combination of both.

26. A design patent includes a single claim that defines the patented design in the form of multiple drawings.  The drawings, also known as "figures," typically present the claimed design from multiple views and the claim is the ornamental design as a whole as depicted in all figures of the patent.

27.  The claimed areas in a design patent are indicated in the drawings with solid lines.  In contrast, broken or dashed lines in the design patent drawings can indicate boundary limits on the claimed design and/or unclaimed features which form no part of the claimed design.  Definition of the types of lines used in patent drawings is provided in the table below:

| | PATENT DRAWINGS |
|---|---|
| ▬▬▬▬▬▬▬ | A continuous thick line used to define the visual edge of a volume claimed in the patent. |
| ▬ ▬ ▬ ▬<br>▬ ▬ ▬ ▬ | A broken line describes the claimed environmental structure not part of the claimed invention. |
| | A broken line consisting of alternating long and short lines indicates a centerline of a structure. "Views must not be connected by projection lines and must not contain center lines." |
| (stippling) | Stippling is used for shading to indicate a textured material and/or to indicate a contrast in color and/or material. |

28.  I understand that the Decker's '941 Patent is at issue and described as a *footwear upper and midsole* and depicts the claimed silhouette and furry appearance using line drawings and stippling as shown below in Figures 1 through 7.

9

FIG. 1

FIG. 3

FIG. 6

FIG. 2

FIG. 4

FIG. 5

FIG. 7

## LEGAL STANDARDS

29.  It has been explained to me by counsel for Deckers that the following legal principles are applicable to the design patents and issues raised here, and I have relied upon these legal principles in forming my opinions set forth in this declaration.

## INFRINGEMENT OF A DESIGN PATENT

30.   It is my understanding that design patent infringement is a question of fact that is evaluated under the "ordinary observer" test.  That test is: "[I]f in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1871).  The test requires that the design be viewed in its entirety and perceived by an ordinary observer familiar with the prior art.  *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008).

31.  I understand that the comparison of the patented and accused designs should focus on the overall appearance of the two designs, as shown in all the figures or views

of the design patent, and should not focus on comparison of individual features in isolation, or on less than all these views or figures.

32. The "ordinary observer" analysis is from the viewpoint of the person who is the ordinary purchaser of the article charged to be an infringement.

33. Here, the patented design is women's footwear and midsole, and the ordinary purchaser, being the ordinary observer, will usually be an adult woman who is interested in purchasing this product, either online or in-person.

34. There are a huge variety of footwear designs on the market, with different features, sizes, and aesthetics. The ordinary purchaser of footwear will consider the overall look and aesthetic, including the conditions in which it may be worn.

## **U.S. PATENT NO. D866,941**

35. The title of the '941 Patent is: "Footwear Upper and Midsole."



11

1

2     36. The claim of the '941 Patent is: "The ornamental design for a footwear

3     upper and midsole, as shown and described."

4     37. I have reviewed the '941 Patent and the UGG® Fluff Yeah Slide

5     embodiment.

6     38.  Though the figures are the best representation of the patented design, I have

7     described various features of the claimed design below consistent with how the

8     claimed design would be viewed by a designer of ordinary skill in the art.

9     39.  Features of the '941 Patent include a platform sling back slide, a platform

10    sole with furry footbed and 360 degree furry midsole around the perimeter sidewall, a

11    wide vamp having a furry exterior, an open toe, and an elastic heel strap extending

12    from one side of the vamp to the other.

13    40.  The stippling appearance claimed in the '941 Patent is clearly visible and is

14    a way to depict the claimed furry appearance.

15    41.  The '941 Patent does not claim any single or specific color.

16    42. Neither the claim, nor the figure drawings of the '941, contain dimensions or

17    measurements for any of the upper and midsole or outsole parts.

18    43.Neither the claim, nor the figure drawings, contain information about weight

19    of the product.

20    44.  The '941 Patent drawings claim an embodiment of a footwear and midsole

21    design having the silhouette and furry appearance as depicted in figures 1 through 7 of

22    the patent.  The embodiment of the '941 Patent is depicted in figures 1 through 7 and

23    disclaims the interior portion outsole bottom view of the slide, and a portion of the

24    inner surface using broken lines.

25    45. An ordinary observer comparing the claimed design of the '941 Patent to the

26    UGG® Fluff Yeah Slide would find the two designs are substantially the same, as

27    shown in **Exhibit 2** depicting the views of the Deckers' UGG® Fluff Yeah Slide

28

corresponding to the views provided in the figures of the '941 Patent.  Therefore, the
UGG® Fluff Yeah Slide is an embodiment of the '941 Patent.

## **INFRINGEMENT**

46. I understand that design patent infringement is evaluated under the "ordinary
observer" test, which is determined by applying an "Ordinary Observer" test.  That test
is: "[I]f in the eye of an ordinary observer, giving such attention as a person usually
gives, two designs are substantially the same, if the resemblance is such as to deceive
such an observer, inducing him to purchase one supposing it to be the other, the first
one patented is infringed by the other." *Gorham Mfg. Co. v. White*, 81 U.S. 511,528
(1871).  The test requires that the design be viewed in its entirety and perceived by an
ordinary observer familiar with the prior art. *Egyptian Goddess, Inc. v. Swisa, Inc*.,
543 F.3d 665 (Fed. Cir. 2008).

47.  I understand that the claimed areas in a design patent are indicated in the
drawings with solid lines and broken or dash lines in the design patent drawings can
indicate limits on the claimed design and/or unclaimed features which form no part of
the claimed design.

48. The '941 Patent claims a portion of a footwear upper.  Applying the claim
drawing practices discussed above, the figure drawing illustrations in the '941 Patent
show that a portion of the inside and outside of the footwear upper and midsole are
claimed.  The illustrator has made multiple clearly defined vamp lines and slingback
strap around the heel are claimed. The '941 Patent does not claim specific
measurements to any one part of the design.

49. I have applied, my over three decades of experience in the footwear industry
to form my opinions in this case regarding infringement and I am confirming my
previous opinion from the de Baere Report dated February 11, 2022 in support of my
analysis where I have formed the following opinions regarding Walmart's
infringement of the '941 Patent.

53.  In comparing the UGG® Fluff Yeah Slide with the Accused Product, Defendant's expert in the Holden Report compares the heel height, vamp thickness and length, strap width, and weight of the two. However, a difference in millimeters between two products does not impact the overall impression in the eyes of an ordinary observer in the marketplace. An ordinary observer in the marketplace is unlikely to compare the millimeter difference between the length and width of the two products. Additionally, Mr. Holden offers a discussion regarding weight of the product, which is not shown, discussed or applicable to the patent or infringement.  Weight, especially, a mere 6 ounce difference, is completely irrelevant as it relates to overall appearance of the UGG® Fluff Yeah Slide and the Accused Product as does Mr. Holden's deconstruction of the two footwear items.

54. It is my opinion that an ordinary observer would find the design claimed in the '941 Patent and the Kendall + Kylie Shani Slipper are substantially the same.  Both feature similar clearly defined multiple vamp lines, a slingback strap that wraps around

//

//

//

//

//

//

//

//

//

//

//

//

//

//

1 | the heel, and feature textured material, specifically a furry midsole unlike the Alleged
2 | Prior Art designs.
3 | ### **TRADE DRESS**
4 |     54. It is my understanding that during his deposition, Walmart's expert, Mr.
5 | Holden, agreed with my opinion from my initial report dated February 11, 2022, as
6 | well as my confirmation of the same, in Paragraph 19 a. above, that the Fluff Yeah
7 | Trade Dress is non-functional.
8 |     I certify under penalty of perjury under the laws of the United States of America
9 | that the foregoing statements, as well as each of the statements in the exhibit attached
10 | to this declaration, are true and correct.
11 |     Executed this Friday, March 11, 2022 in _Mill Valley_, California.
12 |
13 |
14 |                                                Caroline de Baere
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

# Exhibit 1

Brent H. Blakely (SBN 157292)
bblakely@blakelylawgroup.com
Jamie Fountain (SBN 316567)
jfountain@blakelylawgroup.com
BLAKELY LAW GROUP
1334 Parkview Avenue, Suite 280
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Facsimile: (310) 546-7401
Attorneys for Plaintiff
Deckers Outdoor Corporation

*Attorneys for Plaintiff*
*Deckers Outdoor Corporation*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, a Delaware Corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>WALMART, INC., a Delaware Corporation; and DOES 1-10, inclusive,<br><br>                    Defendants. | CASE NO. 2:20-cv-09521-FLA-E<br><br>**INITIAL EXPERT REPORT OF CAROLINE DE BAËRE**<br><br>*HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER* |

Plaintiff Deckers Outdoor Corporation ("Deckers") submits the following Expert Report of Caroline de Baëre pursuant to Fed.R.Civ.P. 26(a)(2)(D)(i) in support of its claims against Defendant Walmart, Inc. in the above-captioned matter.

# **TABLE OF CONTENTS**

I.      INTRODUCTION…………………………………………..…………1

II.     BACKGROUND AND QUALIFICATIONS…………………………….2

III.    INFORAMTION AND MATERIALS CONSIDERED…………………..……5

IV.     SUMMARY OF OPINIONS……………………………………………5

V.      VALIDITY OF THE ASSERTED TRADE DRESS……………………………7

      A.      Relevant Legal Principles……………………………………8

VI.     DECKERS' FLUFF YEAH TRADE DRESS CLAIMS…………………………9

      A.      The Fluff Yeah Trade Dress is Non-Functional……………………10

      B.      The Fluff Yeah Trade Dress is Distinctive and has Acquired
             Secondary Meaning………………………………………………...14

             i.      The Length and Manner of Use of the Asserted Trade
                  Dress…..…………………………………………………17

             ii.     The Exclusivity of Use of the Fluff Yeah Trade Dress…………..19

             iii.    The Volume of Sales………………………………………...20

             iv.     The Amount of Advertising…………………………………21

             v.      The Nature of Advertising……………………………………22

             vi.     Direct Consumer Testimony………………………………...25

             vii.    Search Engine Results………………………………………31

             viii.   Intellectual Property Investment…………………………33

      C.      Summary of Validity Opinion of the Trade Dress…………………34

             i.      The Fluff Yeah Trade Dress is Strong……………………34

D.    Infringement of the Trade Dress………………………………………...35

    i.    Infringement Analysis of the Fluff Yeah Trade Dress……………36

    ii.    Walmart's Kendall + Kylie Shani Slipper is Likely to
Cause Consumer Confusion with the UGG® Fluff
Yeah Slide and its Affiliation with Deckers……………………...36

        a.    The Kendall + Kylie Shani Slipper is
Strikingly Similar to the Design of the Fluff
Yeah Trade Dress……………………………….…………36

        b.    Walmart Markets and Sells the Kendall + Kylie
Shani Slipper to the Same Customer Base as
the UGG® Fluff Yeah Slide………………………………38

        c.    The Most Rational Explanation for the Similarities
Between the Fluff Yeah Trade Dress and the Kendall
+ Kylie Shani Slipper is that Walmart Intentionally
Copied It………………………………………………...…39

VII.    FLUFF YEAH DUPES………………………………………………...39

VIII.   DECKERS' CLAIMS BASED ON THE '941 PATENT………………......42

IX.    WALMART'S PRODUCTS HAVE HARMED DECKERS AND
ITS BRANDS…………………………………………………………..49

## INITIAL EXPERT REPORT OF CAROLINE DE BAERE

## I.    INTRODUCTION

1.    I have been retained by Blakely Law Group, counsel for Plaintiff Deckers Outdoor Corporation ("Deckers" or "Plaintiff"), to serve are a footwear expert witness in the above captioned civil action (the "Action").  At the request of Deckers and its counsel, I prepared the following expert report to provide my opinion regarding Deckers' claims of Patent Infringement and Trade Dress Infringement against Defendant Walmart, Inc. ("Walmart" or "Defendant") in the Action.

2.    My rate of compensation for providing my services as an expert witness in this Action is $425. per hour.  This is a similar rate that I normally charge for work of this type.  My compensation is not dependent upon the outcome of this Action.

3.    In forming my opinions in this report, I considered the documents and information cited herein and relied on my education and vast personal knowledge obtained through thirty-five (35) years of experience in the footwear industry.  As set forth in detail below, my experience includes trend research, footwear design, product development and manufacturing, merchandising, market analysis, product purchasing and sales management.

4.    I reserve the right to modify and supplement my analysis and conclusions set forth in this report based upon any additional fact discovery performed by the Parties or in response to any reports by prepared by other experts in this Action.  I also reserve the right to modify and supplement my analysis and conclusions set forth in this report based upon any changes to any of the applicable legal standards explained to me by counsel for Deckers.

5.    If I am called upon as a witness to testify, whether for purposes of discovery or at trial, I could and would testify competently under oath regarding my opinions set forth herein. In addition to the documents and information cited in this report, at trial I may rely on other evidence cited in any supplemental or amended reports I submit, as well as visual aids to demonstrate certain aspects of my opinions or

the material in this report, which may include demonstratives that I have yet to create. I will select the specific exhibits that I will use at trial by the due date in the trial schedule provided to me by Deckers' counsel.

## II.    BACKGROUND AND QUALIFICATIONS

6.    I am a thirty-five (35) year footwear industry veteran with over twenty (20) years of experience as an independent consultant with proficiency in design, product development, costing, analysis, merchandising, product planning, vendor sourcing, and strategic sales management.  Well-recognized women's, men's, and children's brands I have worked with include Sperry Top-Sider, Keen, Birkenstock, Ariat International, Teva, Red Wing, pediped, Umi Children's Shoes, Livie & Luca, Uniform Advantage and many more.

7.    My footwear experience also includes fifteen (15) years working in a corporate environment as Director of Product Development for globally known brands such as Esprit, LA Gear and Ariat International.  I also held the strategic role of Vice President for a global footwear start up for three (3) years, managing product development, merchandising, operations, production buying and planning and strategic sales management.

8.    During my over thirty-five (35) year career in footwear I have had the opportunity to work with retailers, marketing agencies, tanneries, vendors, sample rooms, and factories and materials suppliers, travelling throughout the United States, China, Mexico, Brazil, France, Spain, Italy, Germany, Indonesia, and Vietnam, sitting side by side with colleagues and industry veterans to design, develop, source, merchandise and purchase seasonal product collections.

9.    In February 2005, I was interviewed about my experience in footwear design and my long career within the industry.  The article, "On My Own," appeared in a major footwear industry trade publication called Footwear News.  I was interviewed in March 2019 by Hidenet.com, a leather industry publication for their "This Week in Leather" feature well as Sourcing Journal for their 2019 industry report on

Sustainability and Transparency in footwear manufacturing.

10.    Since January 2000, I have owned and operated my own footwear industry consulting business.    I provide business management consulting for footwear companies ranging from startups to fortune 500 companies.  As part of my expertise, I specialize in issues of footwear design, development, merchandising, operations, costing, branding, marketing, sourcing, and selling strategies.

11.    My experience also includes over thirty-five (35) years collaborating with marketing teams to provide direct review and decisions relevant to managing catalog content, product merchandising and descriptions, as well as executing the selection of imagery used for strategic marketplace campaigns.  My broad range of expertise also incorporates providing strategic design, merchandising and product planning and development services to footwear brands across all phases of the process, from initial trend research, initiating and creating marketing product briefs to inspire design, through product concepts, managing sales teams, and finally, to final market placement and retail merchandising.  Some of the brands I have done this work for include Livie & Luca, Birkenstock, Ariat International, Umi Children's Shoes, Plae, Red Wing, Uniform Advantage and Sperry Top-Sider.

12.    I am currently an Adjunct Professor of Footwear Design at the California College of the Arts in San Francisco, teaching footwear design to University Junior and Seniors where I have the opportunity to impart my over thirty-five (35) years of knowledge to Industrial Design and Fashion Design students.  I also manage the student internship program for the Industrial Design Juniors and Seniors, advising and preparing them to receive practical industry experience.

13.    I was recently invited through Yellowbrick, an online teaching platform specializing in education and career exploration in the Arts, Media, Sports and Entertainment Industries, to provide a series of guest lectures on sustainability, local manufacturing, intellectual property, job interview preparation and footwear design terminology to students as part of their Spring / Summer 2022 curriculum.

14.    In late 2018, I co-founded a sustainably sourced and manufactured women's fashion footwear and accessory brand, suggies by Ashbury Skies.  The footwear is produced with a vision of reducing carbon emissions and manufactured locally in my home state of California.  My responsibilities include all design, merchandising, material and component sourcing and cost negotiations for the brand. This new collection focuses on local ethically manufactured and sustainable sourcing practices to reverse the negative effects of climate change.

15.    I have authored several short articles on sustainable footwear and local manufacturing in the past ten years.  My experience recently includes speaking engagements from 2019 through the present as a panelist, presenter, moderator and interviewee at conferences as well as podcasts, such as San Francisco Sustainable Fashion Week International, FDRA (Footwear Distributor & Retailers of America) Footwear Design Summit, Sourcing at MAGIC, Product Innovation Apparel Los Angeles & New York, FDRA Shoe Sustainability Week and Footwear Design Summits in Donguan, China and New York, Fashion Institute of Technology New York and Academy of Art San Francisco.  These engagements cover all business facets of the footwear and fashion industry, design, teaching, reducing carbon emissions and sustainability in design and local manufacturing.

16.    I have a degree in International Business from Sacramento State University and studied design at the Academy of Art in San Francisco, California.

17.    I am an active member of several footwear organizations including TWO-TEN Footwear Foundation and Women in Footwear Industry (WIFI).  As I have done for several years, I am currently mentoring a young woman in the footwear industry through a program developed by WIFI.

18.    I am the named inventor in four equestrian boot design patents for footwear: US D785,308 (ornamental design for a boot with notch); US D767,264 (ornamental design for a footwear outsole); US D741,056 (ornamental design for a footwear outsole); and US D398,438 (ornamental design for a boot with zipper).

19.    Attached hereto as **Exhibit A** is a true and correct copy of my curriculum vitae (CV), including a listing of the articles I authored and my speaking engagements.

20.    I have testified at three trials and three depositions in the past four years. Attached hereto as **Exhibit B** is a complete listing of my relevant experience as a testifying expert witness.

### III.    INFORMATION AND MATERIALS CONSIDERED

21.    Attached hereto as **Exhibit C** is a complete listing of the documents I consulted and reviewed in forming my opinion in this case.

22.    In formulating my opinions and preparing of this report, I have relied on my extensive footwear, design and product experience and other materials on which experts in this field usually rely. I have considered information from multiple sources, including information produced in this litigation and information from independent research (including information from the parties' websites/webpages, trade press, and other publicly available sources). I have relied upon the documents and items cited in my report. My citation to any particular document or item does not necessarily mean that these are the sole or primary source for the proposition it is cited for.

23.    I reserve the right to consider further discovery in this case, including reports from other experts, deposition transcripts, and documents produced or made available following issuance of this report, and to supplement my analysis and opinions accordingly and/or respond.

24.    My understanding of applicable legal standards is specifically described in each section below. Generally, I have acquired some exposure to, and working knowledge of, United States patent laws and trademark laws through my product design, product development and merchandising experience. However, I am not an attorney and I rely only on instructions from Deckers' counsel for the legal standards I used in analyzing and rendering my opinions set forth in this report.

### IV.    SUMMARY OF OPINIONS

25.    After reviewing Deckers' allegations against Walmart, the documents and

1  evidence cited herein, in view of my expertise and experience in the footwear industry,
2  it is my opinion that Walmart's Kendall + Kylie Shani Faux Fur Slingback Slipper (the
3  "Kendall + Kylie Shani Slipper") infringes Deckers' UGG® Fluff Yeah Trade Dress
4  and U.S. Patent No. D866,941 ("the '941 Patent").

5      26.     Non-limiting Exemplary Side View Photographs of Deckers Outdoor
6  "UGG® Fluff Yeah Slide" Product, the '941 Patent, and the Kendall + Kylie Shani
7  Slipper are shown below:

  

13  (1)    It is my opinion that the UGG® Fluff Yeah Trade Dress consists of a
14          combination of elements that are non-functional; they do not provide a
15          utilitarian advantage over other footwear designs, and there are many
16          design alternatives available to designers such as myself and others in the
17          footwear industry of skill in the art.

18  (2)    Based on my extensive footwear branding and design experience over
19          more than thirty-five (35) years, it is my opinion that the Fluff Yeah
20          Slide's consistently impressive sales figures and commercial and financial
21          success over a long period of time demonstrates that this distinctive and
22          unique design has acquired secondary meaning as I will demonstrate. The
23          logical inference is: The greater the number of sales of the Fluff Yeah
24          Slide, the greater the number of consumers who have been exposed to
25          product as a designator of the UGG®  brand, and the greater the number
26          of consumers who may associate this style with a single company or
27          source with which they are familiar.

28  (3)    Based on the information in (2) above, the Fluff Yeah Slide has a high

degree of consumer recognition—translating directly to "strong" trade dress. It is also my opinion that customer testimonials through reviews, online comments from relevant consumers, and celebrity endorsements contribute to the secondary meaning of the Fluff Yeah Trade Dress as I will discuss in detail further in my report.

(4)     The Kendall + Kylie Shani Slipper is strikingly similar in appearance to the design of the Fluff Yeah Trade Dress.

(5)     I understand from counsel and what I have seen through my own experience in the marketplace that multiple brands have intentionally copied the Fluff Yeah Slide. It is my opinion that this intentional copying of a successful product such as this also contributes to the secondary meaning of the Fluff Yeah Trade Dress.

(6)     There are no conceivable reasons to explain the design of the Accused Products, except that Wal-Mart directly intended to copy the design of the Fluff Yeah Trade Dress.

27.     These opinions are based on the information already discovered in the case. I understand discovery is ongoing. I may supplement my report based on additional information learned in discovery.

## V.     VALIDITY OF THE ASSERTED TRADE DRESS

28.     As set forth is greater detail below, it is my opinion that the signature Fluff Yeah Slide silhouette used and sold exclusively by the UGG® brand is prominent, famous, and unique as an identifier of the brand. There is no competitive need for Defendants or other competitors to make use of the Fluff Yeah Slide Trade Dress on their shoes. Thousands of other choices are available for any amount of fashion or footwear design consideration or objective. Defendant's use of the Fluff Yeah Trade Dress permits them to trade upon the reputation UGG® has spent years building in the marketplace.

1

## A.    <u>Relevant Legal Principles</u>

2

3        29.    I have acquired some exposure to, and working knowledge of, United

4    States trademark laws through my product design and development experience.

5    Nonetheless, I have relied on my understanding of legal concepts as provided to me by

6    counsel and summarized herein.

7        30.    It is my understanding that a Trade Dress protects only the non-functional,

8    source-identifying features of a product, which may include features such as size, shape,

9    silhouette, and other combinations.  I also understand that Trade Dress protection

10   applies to "a combination of any elements in which a product is presented to a buyer,

11   including the shape and design of a product." *adidas Am., Inc. v. Skechers USA, Inc*.,

12   890 F.3d 747, 754 (9th Cir. 2018).

13       31.    I have been informed by Deckers' counsel that to prove infringement of an

14   unregistered Trade Dress, "a plaintiff must demonstrate that (1) the Trade Dress is non-

15   functional; (2) the Trade Dress has acquired Secondary Meaning; and (3) there is a

16   substantial Likelihood of Confusion between the Plaintiff's and Defendant's products."

17       32.    Counsel has advised me that an unregistered Trade Dress must be shown

18   to have acquired "distinctiveness" to qualify for protection under the Lanham Act.

19   Distinctiveness may be demonstrated through secondary meaning, which I understand

20   is acquired when a substantial portion of the relevant consuming public associates the

21   trade dress with a single, albeit anonymous source.  The focus is on the consuming

22   public, not necessarily the general public.

23       33.    I have been informed by counsel that secondary meaning may be

24   established through direct evidence, such as actual customer testimony and customer

25   surveys, as well as circumstantial evidence, such as advertising expenditures,

26   unsolicited media coverage of the product, nature and extent of advertising and

27   promotion, commercial success, length and exclusivity of the trade dress use, number

28   of customers, established place in the marketplace, efforts made by plaintiff to promote

a conscious connection in public's mind between the trade dress and the plaintiff's

1  product, attempts to plagiarize the trade dress, and proof of intentional copying by

2  competitors. Deckers' counsel has informed me that secondary meaning exists "when

3  the purchasing public associates the dress with a particular source." *Fuddruckers, Inc.*

4  *v Doc's B.R. Others, Inc*., 826 F.2d 837, 843 (9th Cir. 1987).

5  ## VI.    DECKERS' FLUFF YEAH TRADE DRESS CLAIMS

6  34.    Deckers' counsel has informed me and I understand that the following

7  factors can be relevant to a determination of secondary meaning: "(1) whether actual

8  purchases of the product bearing the claimed trade [dress] associate the trade [dress]

9  with the producer, (2) the degree and manner of advertising under the claimed trade

10  [dress], (3) the length and manner of use of the claimed trade [dress] and, (4) whether

11  use of the claimed trade [dress] has been exclusive." *Transgo, Inc. v. Ajac Transmission*

12  *Parts Corp.,* 768 F.2d 1001, 1015 (9th Cir. 1985). In addition, evidence of "deliberate

13  copying [that] may suffice to support an inference of secondary meaning."

14  *Fuddruckers*, 826 F.2d at 844.

15  35.    I understand that in this Action, Deckers has alleged, among other claims

16  against Walmart, that the Kendall + Kylie Shani Slipper infringes on the UGG® Fluff

17  Yeah Trade Dress.

18  36.    In 2018, Deckers introduced the UGG® Fluff Yeah Slide, marketed and

19  featuring the design elements protected under the "Fluff Yeah Trade Dress." The Fluff

20  Yeah Trade Dress is unique and inherently distinctive, and comprised of the following

21  non-functional elements:

22  (1)    A slipper and sandal combined into a statement shoe made famous by

23  the UGG® brand;

24  (2)    A platform, sling back slide;

25  (3)    A platform sole with a furry footbed and furry perimeter sides;

26  (4)    A wide vamp having a furry exterior;

27  (5)    An open toe; and

28  (6)    An elastic heel strap extending from one side of the vamp to the other.

37.    I am relying only on instructions from Deckers' counsel for these standards I have relied on my understanding of legal concepts as provided to me by counsel which are summarized below in each section as needed:

38.    It is my understanding that Trade Dress protection applies to "a combination of any elements in which a product is presented to a buyer, including the shape and design of a product." *adidas Am., Inc. v. Skechers USA, Inc*., 890 F.3d 747, 754 (9th Cir. 2018).   I have been informed by Deckers' counsel that to prove infringement of an unregistered Trade Dress, "a plaintiff must demonstrate that (1) the Trade Dress is non-functional; (2) the Trade Dress has acquired Secondary Meaning; and (3) there is a substantial Likelihood of Confusion between the Plaintiff's and Defendant's products."

39.    As set forth in detail below, based on my review of the cited materials and understanding of legal standards provided by Deckers' counsel, it is my expert opinion that the UGG® Fluff Yeah Trade Dress is non-functional, that it has acquired secondary meaning, and that the Walmart Kendall + Kylie Shani Slipper has a design and appearance substantially similar to Fluff Yeah Trade Dress such that there is a likelihood of confusion between Deckers' and Walmart's products and source.

A.    **The Fluff Yeah Trade Dress is Non-Functional**

40.    I understand that the claimed Fluff Yeah Trade Dress is only protectable as a trade dress if it is "non-functional."  Because "non-functionality" is a legal term, I have relied on the legal standards for non-functionality provided to me by Deckers' counsel in my analysis of the Fluff Yeah Trade Dress.

41.    Specifically, I understand that "[a] claimed trade dress has utilitarian functionality if it is essential to the use or purpose of a product or affects its cost or quality," and a four-factor test determines utilitarian functionality:  (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the

particular design results from a comparatively simple or inexpensive method of manufacture."  *See, e.g., Blumenthal Distrib., Inc. v. Herman Miller, Inc*., No. 18-56471, 2020 WL 3458983, at *4 (9th Cir. June 25, 2020); *Disc Golf Association, Inc. v. Champion Discs, Inc*., 158 F.3d 1002, 1006 (9th Cir. 1998).  "A claimed trade dress has aesthetic functionality if it serves an aesthetic purpose wholly independent of any source identifying function, such that the trade dress's protection under trademark law would impose a significant non-reputation-related competitive disadvantage on its owner's competitors."  *Blumenthal Distrib.,* 2020 WL 3458983, at *4.

42.    I also understand that "[t]he fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of a trade dress."  *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1259 (9th Cir. 2001).  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1050 (9th Cir. 1998) ("[T]he proper inquiry is not whether individual features of a product are functional or nondistinctive but whether the whole collection of features taken together are functional or nondistinctive.").  In view of this standard, in evaluating functionality of the Fluff Yeah Trade Dress, I have considered the whole collection of design elements claimed as trade dress are non-functional.

43.    In my opinion, the collection of features in the Fluff Yeah Trade Dress does not provide a utilitarian advantage over other slide designs in the market.  Here, footwear that embodies the elements of the Fluff Yeah Trade Dress, *i.e.*, the UGG® Fluff Yeah Slide do not have utilitarian functions that "work better" than slides that do not include such elements.  For example, the combined elements of the Fluff Yeah Trade Dress do not make the slide more durable, flexible, or stable.  Nor do they provide any "performance" benefits, such as using a specific sole design might provide for an athletic shoe or cleats that enhances performance on a soccer shoe.

44.    It is also my opinion, based on more than thirty-five (35) years in the footwear industry, that many design alternatives exists to the Fluff Yeah Trade Dress.

1    For example, the heel strap has a multitude of options to fasten to the vamp, including

2    a heel strap that wraps around the ankle, double heel straps, and heel straps that fasten

3    to the sole of the shoe instead of the vamp, to name a few. Additionally, the width,

4    texture, material used, stretch or static, and edging detail of the strap can be modified

5    based on the designer's discretion. Another element is whether a pattern design or logo

6    is applied to the strap design and shape. A footwear designer also has many options in

7    designing the vamp itself. We consider the shape and type of vamp patterning as well

8    as placement in relation to other elements within the overall design. This includes

9    things like a closed toe vamp, a two-piece vamp, an asymmetrical vamp or overlapping

10   vamp pieces.

11        45.    Slide silhouette types can be unlined, partially lined or fully lined. Then,

12   once that is decided, the choices for the material of the lining could be seemingly

13   limitless. For example, materials used in linings include textile, leather, synthetic, mesh,

14   and fleece with differing textures or prints, etc.

15        46.    I am also aware of no advertising for the UGG® Fluff Yeah Slide that touts

16   utilitarian advantages of the design as seen in Paragraph 75 below. Rather, Deckers'

17   advertising for the UGG® Fluff Yeah Slide tends to focus exclusively on its attractive

18   visual appearance, as well as portraying quality in manufacturing materials. For

19   example, shown below is a Deckers' internal marketing slide[1] that I reviewed,

20   indicating Deckers' focus on customers' associations with UGG products as "Easy,"

21   "Stylish," and "Cute":

22

23

24

25

26

27
_____

28   [1] UGG DTC Consumer Profile, March 2021, DOC 001786-DOC 001844 (UGG DTC Consumer
     Profile March 2021.pdf).

1

2

3

4



5

6



7

8

9



10

11

12

13

14    47.    The design of the Fluff Yeah Trade Dress does not result from an

15    inexpensive method of manufacture.  Deckers chooses to offer products that are

16    carefully considered, using high quality materials, and created for longevity.  In fact,

17    there are numerous ways a slide could be manufactured less expensively, such as we

18    see from the copycat brands offering similar silhouettes and described in Section VII

19    below.  Contrary to Deckers, these low end, high volume fast fashion brands tend to use

20    inexpensive materials and offer the products at rock bottom prices.  For example,

21    manufacturers creating products for consumers purchasing sandals and slippers priced

22    under $50 retail normally purchase with less care because these products are intended

23    to only be worn indoors in a casual setting and similarly, inexpensive slippers and

24    sandals are often bought for a season before moving to the next fast fashion trend the

25    following season.

26    48.    These low retail price products such as the Defendant's Accused Products

27    are considered disposable fashion or impulse buys and can often be referred to as "Fast

28    Fashion" by industry professionals.  They are created at a low production cost and

affordable as mass market and high-volume items. These consumers are searching for the next low-price deal and typically inspect their purchase with little attention to detail or the low quality of materials.  On the contrary, "Slow Fashion" speaks to high-quality materials, ethical manufacturing, and the creation of value in the eyes of the consumer similar to the Deckers' UGG® Fluff Yeah Slide which retails for $100.00.

49.     A high level of workmanship and better materials s such as the UGG® brand is knows for in the market and by the consuming public, peaks to longer lasting quality products that last over time.  Using less expensive methods of manufacturing and cheaper materials leads to products that do not stand up to the test of time and longevity.

50.     I understand a second form of functionality—aesthetic functionality—exists if a trade dress "serves an aesthetic purpose wholly independent of any source identifying function, such that the trade dress's protection under trademark law would impose a significant non-reputation-related competitive disadvantage on its owner's competitors."  *Blumenthal Distrib., Inc. v. Herman Miller, Inc*., No. 18-56471, 2020 WL 3458983, at *4 (9th Cir. June 25, 2020).  I do not see how the Fluff Yeah Trade Dress could be said to serve an aesthetic purpose wholly independent of any source identifying function, but even if it did, it is my opinion that the many design alternatives available to Walmart mean that Deckers' trade dress rights in the Fluff Yeah Trade Slide do not put Walmart at a significant non-reputation-related competitive disadvantage.

51.     Based on the foregoing analysis and my understanding of the legal standards provided to me by Deckers' counsel, it is my opinion that the UGG® Fluff Yeah Trade Dress is non-functional as the term is used in the trade dress context.

**B.     <u>The Fluff Yeah Trade Dress is Distinctive and has Acquired Secondary Meaning</u>**

52.     As I discussed earlier in my report, I have been informed by counsel that Secondary Meaning may be established through direct evidence as well as circumstantial evidence.

53.     The Fluff Yeah Trade Dress consists of Deckers' UGG® Fluff Yeah Slide used exclusively by the brand as shown in the photograph below.  Based on my design and footwear market experience earned over 35+ years of research and development in the footwear industry, and visiting seasonal fashion and footwear tradeshows globally, it is my opinion that both direct and circumstantial evidence exist, demonstrating that the UGG® Fluff Yeah Slide has acquired secondary meaning in the minds of the relevant consuming public.



54.     Although I reached my conclusions solely based on the above legal standards provided to me by Deckers' counsel, the underlying rationale comports with my years of experience in the footwear industry.  For example, based on my design and branding expertise, I know that it is common for companies to build an association in the minds of consumers between a product and its source by utilizing combination of design aspects that make the product stand out from its competitors.   In the footwear industry particularly, consumers have learned to recognize design aspects appearing on a shoe as source-identifying features associated with one particular brand.  One obvious example is consumers' recognition, without any other information, that Nike is the source of a shoe bearing a "swoosh."

55.     But for decades, designers in fashion and particularly in the footwear industry have been working in many other ways to allow and teach consumers to associate their products with a certain source.  For example, a consumer may only need to see the deep red color on the bottom sole of a women's dress shoe to recognize "Louboutin."  Or they may come across a canvas-and-rubber tennis shoe such as the

one pictured below[2] with a stripe on the sidewall, contrast stitching on the upper, and a smooth white shell toe and immediately think "Converse" and "Chuck Taylors."



56.    Below are two other designs, one from footwear and one accessory that are both widely recognized in the footwear and fashion industry as coming from one single source.

57.    We are all familiar with Adidas three stripes which the brand executes using several design methods, including the famous Stan Smith silhouette shown below[3].  It features the three-stripes, combined with a cup sole and their known heel tab overlay in a shape that has become recognizable since the 1980s.  Many consumers will vividly remember seeing well known tennis players sporting this shoe:



---

[2] Converse, *Chuck Taylor All Star*, https://www.converse.com/shop/p/chuck-taylor-all-star-unisex-low-top-shoe/M9166.html?dwvar_M9166_color=black&styleNo=M9166&cgid=mens-classic-chuck-shoes (last visited January 26, 2022).

[3] Adidas, *Stan Smith Shoes*, https://www.adidas.com/us/stan-smith-shoes/B24105.html (last visited January 26, 2022).

58.    The same holds true for legendary Coco Chanel.  We are all familiar with those globally recognizable iconic interlocking Cs found on handbags, apparel, footwear, and more products associated with the brand.  The image below[4] is a perfect example depicting how a distinctive product can comes from one single source.



i.    **The Length and Manner of Use of the Asserted Trade Dress**

59.    In my experience, the way a brand uses a source-identifying feature may also contribute to its distinctiveness. Generally speaking, the distinctiveness of a brand's source-identifying feature is best established by consistently using the same source-identify features such as done by Deckers of a platform, sling back slide with a furry footbed and perimeter, wide vamp, open toe and logo elastic strap around the back.in a similar manner.  By using the same design, as noted above, on a single silhouette, a brand can create the consistent story that become more recognizable,

---

[4] Coco Chanel, https://www.chanel.com/us/fashion/p/AS2431B07674NH297/mini-flap-bag-with-top-handle-lambskin-gold-tone-metal/ (last visited January 30, 2022).

1    especially over time

2        60.    Based on my footwear design and marketing expertise, it is my opinion

3    also that Deckers' consistent use of the same logo identification in the same

4    unconventional location as a back strap and confined to the same distinct design in the

5    same type of a product such as an open toe slide, reinforces brand recognition and

6    causes consumers to associate the only common feature across these products as a

7    source-identifying feature of the UGG® brand.  The fact that Deckers has used only

8    one design for the past four years is highly unusual for a footwear brand, and greatly

9    increases the distinctiveness.

10        61.    As evidenced by the examples of Converse, Louboutin, and Adidas

11    footwear designs above, one way to establish the mental association between a brand

12    and a product's design features is to use those design features consistently over time.

13    In my opinion, Deckers has done just that—through the consistent use of the Fluff Yeah

14    Trade Dress design in marketing UGG® Fluff Yeah Slides.  For example, as shown

15    below, it established an association in consumer's minds that any products bearing such

16    a design are sourced solely from Deckers.



27        62.    By using the same design features of the Fluff Yeah Trade Dress in the

28    same way and in the same place in the footwear silhouettes, Deckers created a consistent

story that became unique and distinctive to the ordinary consumer with respect to the
UGG® Fluff Yeah Slide.

### ii.  The Exclusivity of Use of the Fluff Yeah Trade Dress

63.   Based on my experience in the footwear industry, a shoe's distinctive
design is more likely to serve as a source-identifying feature if that design has
predominately been used by only one brand in the marketplace.  Unique or innovative
elements in products design such as patterning and logo placement, used repeatedly by
brands, creates an impression that conditions the consumer in the marketplace to
recognize it and therefore, identify it solely with that particular brand.  This is
commonplace with upper designs such as the Adidas three-stripe black lines on the side
profile of a sneaker.  What is unique about Deckers' is that they have created this same
identification through the exclusive use of a particular silhouette and look with their
unique platform, sling back slide with a furry footbed and perimeter, wide vamp, open
toe and logo elastic strap around the back.

64.   As part of my analysis, I examined whether Deckers has exclusively used
the UGG® Fluff Yeah Slide design since the launch in 2018.  I confirmed that Deckers
has exclusively used and sold this product in the relevant marketplace.  As explained in
Section VI.B.viii below in further detail, Deckers has consistently enforced its
intellectual property rights against any brand who has products that are considered to
infringe on the Fluff Yeah Trade Dress.

65.   Based on my footwear design and branding expertise, my opinion is that
Deckers' exclusive use of the features such as platform sole, furry footbed and exterior,
and elastic heel strap continuously in marketing UGG® Fluff Yeah Slides is strong
evidence that the design of the Fluff Yeah Trade Dress has acquired secondary meaning
in the minds of the relevant consuming public.

### iii.  The Volume of Sales

66.    It is my opinion that the commercial success of the UGG® Fluff Yeah
Slide also demonstrates that it has acquired secondary meaning.  As noted earlier in my

summary, it is my understanding that sales figures are relevant evidence from which to infer the existence of secondary meaning. The logical inference is this: The greater the number of sales of UGG® products the greater the number of consumers who have been exposed to the Mark as a designator of UGG®, and the greater the number of consumers who may associate the Fluff Yeah Slide with a single company or source with which they should be familiarized, like the UGG® brand. Simply put, it is a logical inference that consumers associate the Mark to the company with which they are familiar.

67.     Generally speaking, open toe sandals and slides tend to have a shorter selling season for most brands in the market, usually ranging from early spring through summer, from January or February through July. This is not the case with UGG® Fluff Yeah Slide as it is clearly demonstrated here by the number of pairs sold. ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████     Based on information I reviewed which I understand to be verified by Deckers, the sales quantities for UGG® Fluff Yeah Slide each year are shown in the table below:

| 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|
| ████ | ████ | ████ | ████ |
| █████ | █████ | █████ | █████ |

68.     The UGG® Fluff Yeah Slide was first introduced by Deckers in 2018 and since then has sold approximately ████ pairs over 3.5 years on the market, corresponding to over $████ in total sales revenue. Based on my experience, the number of pairs sold and longevity in the market are highly unusual in the footwear industry. In the footwear industry, we even have a special name for such products that continue to sell year after year: "Hero" products, and Hero products are exceptionally rare. Most footwear companies and apparel brands in general move away from designs

after one to two years, and necessarily develop new products to replace products with declining sales and popularity.  The market and consumers demand this, especially in today's internet and social media driven marketplace where consumers have access to making purchases quickly and trends on the market can change overnight.

### iv.  The Amount of Advertising

69.    It is my understanding that the amount of money Deckers has spent in promotion and advertising of the UGG® Fluff Yeah Slide Trade Dress is relevant to the issue of secondary meaning.  Like sales volume, the logical inference is the larger the amount of money spent on advertising, the greater the exposure of buyers to the Fluff Yeah Slide; the greater the exposure, the greater the likelihood that buyers in stores and online will associate the Fluff Yeah Slide with one seller in a trademark sense.

70.    Furthermore, it is my understanding that marketing expenditures by Deckers in promoting and advertising the UGG® Fluff Yeah Slides under the Fluff Yeah Trade Dress can also be indicative of secondary meaning.  In my experience, and as one would imagine, typically more advertising expenditures translates directly to more exposure to buyers and higher sales volume.

71.    Based on information from data provided by counsel I reviewed in Deckers' discovery responses, which I understand to be verified by Deckers, I understand that Deckers has spent over $███████  on advertising and marketing associated with the UGG® Fluff Yeah Slide since 2018.[5]  These costs are significant for any brand.  In my experience, footwear companies such as Deckers may run hundreds of ads at the same time to capture a global audience of millions through social media, print, banners, store fronts and many other possible venues.  With respect to the promotion of the UGG® Fluff Yeah Slide, $███████ translates to an enormous amount of exposure far more than most companies I am aware of.

72.    Based on my design and branding experience in the footwear industry, it

---

[5] Deckers Fluff US Spend, DOC 002559

is my opinion that the amount of Deckers' advertising spend demonstrates that the Fluff Yeah Slide has acquired secondary meaning.

### v. <u>The Nature of Advertising</u>

73.    Aside from the amount of advertising, it is my understanding that the manner of Deckers' advertising is likewise relevant to the issue of secondary meaning. To that end, I conducted an independent examination of advertisements provided to determine whether the manner of this advertising has caused consumers to associate the Fluff Yeah Slide with a single source.  Based on my design and branding expertise, it is my opinion that Deckers' advertising in visual media has consistently taught consumers to associate the Fluff Yeah Slide with a single source: UGG®.

74.    As one example, the photographs used, accentuate, and point out to the consuming public the elements of the Fluff Yeah Trade Dress, as shown in the exemplary advertisements below. Based on my footwear design and branding expertise, these types of advertisements show the unconventional combination of the design.  As a result, consumer brand association with UGG® becomes stronger with each advertisement view.

75.    Deckers has distinguished itself from the competition by promoting and advertising the Fluff Yeah Trade Dress consistently over the past three and a half (3.5) years.  Marketing footwear products using the same design elements repeatedly creates an impression that teaches consumers to recognize and identify it solely with that particular brand.  The images below show Deckers' consistent promotion of UGG® Fluff Yeah Slides since its introduction:



***UGG® Fluff Yeah Slide Advertisement in 2018[6]***

***UGG® Fluff Yeah Slide Advertisement in 2019[7]***

---

[6] AW18 Fluff Power Directive, DOC 002247-DOC 002270

[7] AW19 Transition Directive Drop Two, DOC 001875-DOC 001963

1
2
3
4
5
6
7
8
9
10
11



*UGG® Fluff Yeah Slide Advertisement in 2020*[8]

12
13
14
15
16
17
18
19
20
21
22

*UGG® Fluff Yeah Slide Advertisement in 2021*[9]

23
24
25
26
27
28

---

[8] YouTube, FEEL LOVE with LaRayia Gaston, https://www.youtube.com/watch?v=rBnSd0-avdM (last accessed January 27, 2022)

[9] UGG Holiday 2021, "The Perfect Teen Gift", https://www.youtube.com/watch?v=IviF9sqU99s (last accessed January 27, 2022)

## vi.  <u>Direct Consumer Testimony</u>

76.    As part of my analysis, I also considered whether any consumers from the relevant purchasing public have actually associated the Fluff Yeah Slide with UGG® or a single anonymous source.  It is my understanding that while evidence that a consumer has actually associated a trade dress with a single source, is not necessary to a finding of secondary meaning.  I understand that unrebutted testimony of actual recognition may support a finding of secondary meaning. The secondary meaning survey conducted in this matter employed a scientific experimental design consisting of two survey cells: (1) a test cell designed to measure the secondary meaning, if any, of the appearance of the Fluff Yeah slipper; and (2) a control cell designed to measure the extent of potential mismeasurement error or "noise" in the test cell survey results. After reviewing the survey results, it is my opinion that the results of the survey support a finding that Deckers has achieved secondary meaning in the appearance of the Fluff Yeah slipper. The survey results evidence that 39% of females 18 years of age and over who have either purchased a pair of slippers costing approximately $50 or more in the past 6 months or are likely to purchase a pair of slippers costing approximately $50 or more in the next 6 months – recognize the Fluff Yeah slipper as distinctive and UGG® as the source.

**TABLE 1**

**TEST CELL**

| | | | |
|---|---|---|---|
| Q1 | Do you associate the overall appearance of this slipper with any particular brand or brands? | | |
| Q2 | What brand or brands? | | |
| Q3 | Do you associate the overall appearance of this slipper with <u>one brand</u> or <u>more than one brand</u>? | | |

| Response Category | | Number | Percent |
|---|---|---|---|
| 1. | Association with UGG/one brand | 90 | 45.0 |
| | UGG | 89 | 44.5 |
| | Unknown name – One brand | 1 | 0.5 |
| 2. | Association with other brand(s) | 27 | 13.5 |
| | Other named brand(s)* | 21 | 10.5 |
| | Unknown names – More than one brand | 3 | 1.5 |
| | Don't know or no opinion | 3 | 1.5 |
| 3. | No association with any brand or brands | 83 | 41.5 |
| Total | | 200 | 100.0 |

| TABLE 2 |||
|---|---|---|
| **CONTROL CELL** |||
| Q1    Do you associate the overall appearance of this slipper with any particular brand or brands? |||
| Q2    What brand or brands? |||
| Q3    Do you associate the overall appearance of this slipper with <u>one brand</u> or <u>more than one brand</u>? |||
| Response Category | Number | Percent |
| 1.    Association with UGG/one brand | 12 | 6.0 |
|         UGG | 4 | 2.0 |
|         Unknown name – One brand | 8 | 4.0 |
| 2.    Association with other brand(s) | 38 | 19.0 |
|         Other named brand(s)* | 30 | 15.0 |
|         Unknown names – More than one brand | 3 | 1.5 |
|         Don't know or no opinion | 5 | 2.5 |
| 3.    No association with any brand or brands | 150 | 75.0 |
| Total | 200 | 100.0 |

77.    Furthermore, we can also consider that commercial success is often due in part and evidenced through celebrity and social media coverage, which serves to promote and confirm in the minds of consumers, that a product is novel and aspirational. Deckers has long recognized this fact, for example, as shown in Deckers' internal presentation slide[10] below:

---

[10] UGG DTC Consumer Profile March 2021, DOC 001786-DOC 001844





78.    Over the past 20 years celebrities seen wearing UGG® products in general and including the Fluff Yeah Slides have included Kylie Jenner, Hailey Bieber, Gigi Hadid, Megan Fox, Kate Hudson, Sarah Jessica Parker, and many others.  Below I have included just a few examples[11] of the many photos of celebrities wearing UGG® Fluff Yeah Slides that I reviewed and researched in writing this report.

---

[11] Addison Rae, DOC 001757; Brie Larson, DOC 000225; and Megan Fox, DOC 001069.




*From left to right, UGG® Fluff Yeah Slides worn Addison Rae, Brie Larson, and Megan Fox*



*Sofia Richie in the UGG® Fluff Yeah Slides, @sofiarichie Instagram Stories*

*Chantel Jeffries wearing UGG® Fluff Yeah Slides, @chanteljeffries Instagram Stories*

79.    UGG® Fluff Yeah Slides has also received extensive and favorable media coverage on its innovative product designs.  The two examples[12] from BuzzFeed and ET are shown below from the many that I reviewed in writing this report.

---

[12] BuzzFeed, *28 Comfortable Pairs of Shoes the BuzzFeed Shopping Team Swears By*, DOC 001554; ET, *Celeb-Approved Mother's Day Gift Ideas*, DOC 001573.




80.    Strong and positive impressions on the relevant consuming public are often considered by others when making product purchases.  Customer feedback allows relevant consumers a unique opportunity to read and learn so much more than anyone could previously consider when making purchases.  It is clear from reading customer feedback and reviews that Deckers' UGG® brand and specifically, the Fluff Yeah Slide has such a large following as to have acquired status among consumers.

81.    For example, I have reviewed Deckers' compilation of customer reviews of the Fluff Yeah Slide[13] from various sources wherein customers describe the appeal of the design, look, and style of the Fluff Yeah Slide.  It is clear from these product reviews that customers are drawn to the distinct look/style of Fluff Yeah Slides, due to reviews describing as "cute," "stylish," and "trend setting."  I also believe the product reviews regarding the Fluff Yeah Slide clearly reference a long felt and unresolved need as demonstrated by the select reviews below:

- *"These are very different in the best way possible!"*

---

[13] Fluff Yeah Cust Reviews, DOC 002560.

- *"I love these slippers they are the best creation Ugg ever made!"*
- *"I love uggs, but these are the best they've created it's way better than your average slides"*
- *"These slides ladies YASSSS!! They are really comfortable and durable can't forget to mention cute. The are different They have a unique style kinda like a statement slide"*
- *"By far the most sought out UGG product! Get them for yourself, or that special woman in your life. The only con I have is that the black eyes your feet. Other than that, match Cardi B in style."*
- *"My sister tries my slippers all the time because......they're so freaking cute on your feet and cozy! They feel so durable(per usual quality of UGG) and comfy. Just want to wear them everywhere, especially at work but that is so not appropriate in an office setting. I'm on the verge of saying "oh well" because I love these. (joking, but still a must have)  ;)"*
- *"Haaaappy Friday!! These slides are such a pleasant experience! I literally get complimented and questioned about the comfort of them everywhere I go! I am all about the UGG life and these babies did not disappoint!!"*

82.     It is my opinion, based on my many years of design and branding experience in the footwear industry, that the customer reviews, celebrity recognition, extensive, and favorable media coverage and editorials clearly demonstrates that the Fluff Yeah Slide has acquired secondary meaning with the relevant consuming public.

### vii.  Search Engine Results

83.     As part of my analysis, I also examined search engine results to determine whether the Fluff Yeah Slide has acquired secondary meaning.  It is my understanding that search engine results, such as those of Google, can be an accurate proxy for the meaning and distinctiveness of a product's source-identifying features.

84.     This is because Google's search algorithm that determines listings is based on the frequency with which users click on the top search results and is generally able "to predict what online content consumers associate with a search term."[14]  To that end,

---

[14] The Google Shortcut to Trademark Law, 102 Calif. L Rev 351, 363 (2014) ("My narrowest claim is that Google and other online search results can serve a function similar to survey data for evaluating distinctiveness where time or cost constraints make it infeasible to conduct a survey. … My broader claim is that Google results can supplant a significant portion of current trademark strength and likelihood-of-confusion inquiries.").

I conducted several different searches on Google to determine whether consumers associate the Fluff Yeah Slide with a single source.

UGG FLUFFY = About 19,100,000 results (1.05 seconds) [15]



FLUFFY SLIDES = About 189,000,000 results (0.95 seconds) [16]

---

[15]
https://www.google.com/search?q=ugg+fluffy&rlz=1C1UEAD_enUS927US927&oq=ugg+fluffy&aqs=chrome..69i57j0i512j0i10i433j0i10j0i512l3j0i10j0i512l2.9807j1j15&sourceid=chrome&ie=UTF-8

[16]
https://www.google.com/search?q=fluffy+slides&rlz=1C1UEAD_enUS927US927&sxsrf=APq-WBt9D55iMRBkd--2LZLjbtBRtN9KgA%3A1643575038327&ei=_vb2YZ-pE8fFkPIPms2bgA8&ved=0ahUKEwifoMiSqtr1AhXHIkQIHZrmBvAQ4dUDCA4&uact=5&oq=fluffy+slides&gs_lcp=Cgdnd3Mtd2l6EAMyBQgAEJECMggIABCABBCxAzIFCAAQgAQyBQgAEJECMgUIABCRAjIFCAAQgAQyCAgAEIAEEMkDMgUIABCABABDIFCAAQgAQyBAgAEIAEOgQIABBDOgoILhDHARCvARAnOgcIABCxAxBDSgQIQRgASgQIQRhgAUABYyRRg_hdoOAHACeACAAdoBiAHRDpIBBjAuMTIuMZgBAKABAcABAQ&sclient=gws-wiz



85.    Interestingly, the first product to show up on the two searches above are the UGG® Fluff Yeah Slides, indicative of the famous nature of the product in just under 4 years.  Additionally, there were MILLIONS of results to my inquires.

86.    Once again, based on my footwear design and marketing experience, it is my opinion that the results of my Google searches indicate that the UGG® Fluff Yeah Slide has acquired secondary meaning.

### viii.   Intellectual Property Investment

87.    It is my understanding that Deckers, recognizing the value of its distinctive designs, has made a substantial investment in its intellectual property portfolio early on by filing for, and obtaining, over two-hundred patents and trademarks covering the various products within their portfolio of products.  Deckers also spends considerable resources yearly enforcing its intellectual property rights, including the Fluff Yeah Trade Dress and the '941 Patent at issue in the Action.

88.    Based on information provided to me by Deckers' counsel, Deckers has filed approximately fifteen lawsuits asserting the Fluff Yeah Trade Dress and/or the '941 Patent, a full list is attached as Exhibit D.  Each defendant in these lawsuits attempted to trade on the goodwill and reputation of the UGG® Fluff Yeah Slide

developed by Deckers.

89.     In my experience, such a vast number of competitors clearly demonstrates the market awareness of the Fluff Yeah Trade Dress and unique source-identifying features popular among consumers.  Precedent from other legal matters has been set by Deckers in enforcing the Fluff Yeah Trade Dress and the '941 Patent.  Such precedent not only shows enforcement efforts, but also demonstrates that the UGG® Fluff Yeah Trade Dress has acquired secondary meaning.

90.     Based on my analysis, it is my opinion that Deckers' Fluff Yeah Trade Dress has acquired secondary meaning due to brand recognition that this product is produced by Deckers.  Length and manner of use, exclusivity, commercial success, advertising expenditure, positive customer feedback, intentional copying and legal precedent all result in the relevant purchasing public associating the design of the Fluff Yeah Trade Dress with Deckers.

**C.     Summary of Validity Opinion of the Trade Dress**

**i.     The Fluff Yeah Trade Dress is Strong**

91.     My analysis and opinions in Section V.C above regarding secondary meaning of the Fluff Yeah Trade Dress is also applicable to the strength of the Fluff Yeah Trade Dress.

92.     In short, it is common to see footwear brands develop and offer multiple new collections every year, changing the looks and continuously reinventing themselves.  Deckers, on the other hand, has spent more than 3.5 years developing relationships with consumers and building a strong reputation for offering high quality aspirational products, and has sold the UGG® Fluff Yeah Slide consistently over these few years without reinventing or changing the product.  This makes the rapid popularity of the UGG® Fluff Yeah Slide a notable outlier in the industry.  This fact, combined with the sales figures in the millions, consistent advertising, strong customer feedback, and celebrity recognition, it is my opinion that the Fluff Yeah Trade Dress is a powerful

and well-recognized source indicator.

93.    Based on the preceding analysis, it is my opinion that the Fluff Yeah Slide has acquired distinctiveness in the eyes and minds of the relevant consuming public.

**D.    INFRINGEMENT OF THE TRADE DRESS**

94.    As set forth in greater detail below, it is my opinion that Defendants' use of the Asserted Trade Dress in the Accused Products creates a likelihood of confusion by causing the ordinary consumer to mistake Deckers as the source of the Accused Product.  At a minimum, it is my opinion that the ordinary consumer would mistakenly believe that the Accused Product is affiliated, sponsored, or associated with Deckers.

95.    Although I have acquired some exposure to, and working knowledge of, the trademark and trade dress laws in the United States, I do not consider myself to have an expertise in these laws.  I do, however, consider myself to have an expertise in footwear product design and marketing.  Further, in rendering the opinions expressed in this section of the report, I have relied on my experience earned working in the footwear industry for over thirty-five (35) years, in addition to my understanding of legal concepts as provided to me and summarized herein.

96.    It is my understanding that the test for trade dress infringement is whether the Defendant's activities have created a likelihood of confusion, deception, or mistake as to the source of the goods of the parties, or as to the affiliation, connection, or association between the parties. This is viewed from the perspective of the eye and mind of an ordinary consumer.

97.    It is my understanding that likelihood of confusion is normally determined by a visual comparison of the parties' use of the trade dress, from the perspective of its impact on the eye, and mind of ordinary members of the purchasing public.  It is also my understanding that this comparison requires an examination of the total image of the trade dress at issue, not just the dissimilarities in particular elements.

**i.    Infringement Analysis of the Fluff Yeah Trade Dress**

98.    Based on my footwear design and branding expertise, it is my opinion that Defendants' use of the Fluff Yeah Trade Dress likely causes ordinary consumers to mistake Deckers as the source of the Accused Product, or at the very least, to mistakenly believe that the Accused Product is affiliated, sponsored, or otherwise associated with Deckers.  It is my understanding that the similarity between the design of UGG® Fluff Yeah Slide and that of the Accused Product is relevant to determining a likelihood of confusion.  When brands use design concept execution that looks similar, there is a direct connection between the two that occurs to the consumer, thereby creating a likelihood of confusion as to the source.

ii.    **Walmart's Kendall + Kylie Shani Slipper is Likely to Cause Consumer Confusion with the UGG ® Fluff Yeah Slide and its Affiliation with Deckers**

99.    As described in the following sections, it is my opinion that Walmart's Kendall + Kylie Shani Slipper is likely to cause confusion in the marketplace among consumers.

100.    I understand that likelihood of confusion turns on whether a reasonably prudent consumer would be confused about the source of the goods.  *adidas Am., Inc. v. Skechers USA*, Inc., 890 F.3d 747, 755 (9th Cir. 2018).  The following factors should be considered in evaluating likelihood of confusion: (1) strength of the trade dress, (2) similarity between plaintiff's and defendant's trade dress, (3) evidence of actual confusion, (4) marketing channels used, (5) type of goods, (6) the likely degree of purchaser care, and (7) the defendant's intent in selecting its trade dress.  *Id*.

a.    **The Kendall + Kylie Shani Slipper is Strikingly Similar to the Design of the Fluff Yeah Trade Dress**

101.    In my opinion, the similarity between the Fluff Yeah Trade Dress and the look of the Kendall + Kylie Shani Slipper is uncanny.  As shown below, the Kendall + Kylie Shani Slipper copies each one of the characteristically distinct combinations of design features of the Fluff Yeah Trade Dress, in my opinion for no other purpose than

to misappropriate Deckers' goodwill and appeal of the UGG® Fluff Yeah Slide to its customers.

102.   A visual comparison of Fluff Yeah Slide and the Accused Product reveals that both clearly use the Fluff Yeah Slide Trade Dress.   Indeed, as shown in the comparison chart below, both products use the Trade Dress elements.

103.   Specifically, I clearly illustrate that the Kendall + Kylie Shani Slipper features each element of the Fluff Yeah Trade Dress:

> (1) A slipper and sandal combined into a statement shoe made famous by the UGG® brand;
>
> (2) A platform, sling back slide;
>
> (3) A platform sole with a furry footbed and furry perimeter sides;
>
> (4) A wide vamp having a furry exterior;
>
> (5) An open toe; and
>
> (6) An elastic heel strap extending from one side of the vamp to the other.



***Comparison of design features of the Kendall + Kylie Shani Slipper (L) identical or nearly
identical to the five elements of the Fluff Yeah Trade Dress (R) by Caroline de Baere.***

1

2

3

4

5

6



7

8

*The Kendall + Kylie Shani Slipper (R) compared side by side with the Fluff Yeah Slide (L) by*
*Caroline de Baere*

9    104.   What I find shocking about the Kendall + Kylie Shani Slipper—and what

10  laypersons may not appreciate—is that Walmart has designed its slide to closely copy

11  the Fluff Yeah Trade Dress *using drastically different and much less expensive*

12  *materials*. For example, the Kendall + Kylie Shani Slipper uses very shiny and cheap

13  faux synthetic fur for the upper in stark contrast to the real lamb fur used by UGG®.

14  The Kendall + Kylie Shani Slipper also uses an inexpensive synthetic textile in contrast

15  as well to the lamb fur lining on the UGG® Fluff Yeah Slide.  The outsole bottom on

16  the Walmart slipper is made of a microfiber type fabric while the UGG® slide uses a

17  rubber outsole that is created using a mold where the logo has been inserted in a second

18  color.  A two-color mold such as used here by UGG® is more expensive and offers

19  additional branding.

20    105.   In summary, it is my opinion that the Kendall + Kylie Shani Slipper is

21  extremely and confusingly similar to the design of the Fluff Yeah Trade Dress.

22             **b.    Walmart Markets and Sells the Kendall + Kylie Shani**

23                      **Slipper to the Same Customer Base as the UGG® Fluff**

24                      **Yeah Slides**

25    106.   Both Deckers and Walmart compete in the same marketplace with respect

26  to the footwear products at issue in the Action and compete for the same customers

27  through a similar OMNI Channel distribution strategy: these are brand owned retail

28  stores and Direct-to-Consumer online venues.  Specifically, in my opinion, Walmart

markets and promotes the Kendall + Kylie Shani Slipper directly against the UGG® Fluff Yeah Slide.

**c.    The Most Rational Explanation for the Similarities Between the Fluff Yeah Trade Dress and the Kendall + Kylie Shani Slipper Is that Walmart Intentionally Copied It**

107.    Due to the vast similarities between the design of the Fluff Yeah Trade Dress and the Kendall + Kylie Shani Slipper described and shown in the comparison photos in Section V.E.b.i above, it is my opinion that the Kendall + Kylie Shani Slipper looks the way it does because Walmart intentionally copied the design of the Fluff Yeah Trade Dress to trade upon its goodwill and reputation.

108.    As noted above, it is remarkable that the Kendall + Kylie Shani Slipper not only closely copies the design of the Fluff Yeah Trade Dress, but also *using drastically different and much less expensive synthetic materials*.    Based on my extensive experience working with suppliers and sourcing partners globally over more than three decades, designing footwear products, this type of copying always takes considerable effort, much like it would take effort to mimic the look of a watercolor painting using a computer printer.    Thus, in my opinion, this would strongly suggest that Walmart intentionally copied the design, as opposed to accidently stumbling across an identical, but cheaper design.

109.    Based on the preceding analysis and my understanding of the legal standards provided by Deckers' counsel, it is my opinion that the Kendall + Kylie Shani Slipper infringes the Fluff Yeah Trade Dress.

**VII.    FLUFF YEAH DUPES**

110.    As part of my analysis, I also reviewed online articles and comments regarding "dupes" of the UGG® Fluff Yeah Slide.    For example, below is an article by

StyleCaster[17] where "dupes" of the UGG® Fluff Yeah Slide are advertised:





111.   Additionally, I received a list from counsel, that is included below, of Intellectual Property cases filed relating to Copycat brands of the famous UGG® Fluff Yeah Slide Trade Dress.  It is also clearly apparent from the comparison images where we can view examples from multiple brands side by side, that many have chosen to replicate the look, colors, silhouette, styling, and furry feel of the product for their own sale and benefit.

---

[17] Style Caster, *These Are The Best UGG Fluff Yeah Slipper Dupes We've Seen - & they're Only $20*, February 5, 2021 (https://stylecaster.com/ugg-fluff-yeah-slipper-dupes/) (Last accessed January 30, 2022)

| Deckers Fluff Yeah Cases | |
|---|---|
| Deckers Outdoor Corporation | Bebe Stores, Inc. (2021) |
| Deckers Outdoor Corporation | Ego Shoes Limited (2020) |
| Deckers Outdoor Corporation | Five Below, Inc. (2020 ) |
| Deckers Outdoor Corporation | Kimera International (2021) |
| Deckers Outdoor Corporation | Lorlie Investment Group (2020) |
| Deckers Outdoor Corporation | Public Desire (2020) |
| Deckers Outdoor Corporation | Walmart (2020) |
| Deckers Outdoor Corporation | Fashion Nova Inc. (2020) |
| Deckers Outdoor Corporation | Gap (2021) |
| Deckers Outdoor Corporation | Legend Footwear Inc. (2020) |
| Deckers Outdoor Corporation | Lola & Soto Business Group (2020) |
| Deckers Outdoor Corporation | Lucy Avenue (2020) |
| Deckers Outdoor Corporation | Shoetopia, Inc. (2020) |
| Deckers Outdoor Corporation | Steve Madden (2020) |
| Deckers Outdoor Corporation | Fashion Marketing & Merchandising (2020) |



**Fluff Yeah Dupes**

| UGG ® Fluff Yeah Slide | Ego Shoes Limited (2020) |
|---|---|

| UGG ® Fluff Yeah Slide | Lorlie Investment Group (2020) |
|---|---|

SNUGGLES-05
*multi*

| UGG ® Fluff Yeah Slide | Fashion Nova Inc. (2020) |
|---|---|

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



| | |
|---|---|
| UGG ® Fluff Yeah Slide | Legend Footwear Inc. (2020) |
| UGG ® Fluff Yeah Slide | Lola & Soto Business Group (2020) |

27

## VIII.  DECKERS' CLAIMS BASED ON THE '941 PATENT

28    112.  I understand that design patent infringement is evaluated under the

"ordinary observer" test, which is determined by applying an "Ordinary Observer" test. That test is: "[I]f in the eye of an ordinary observer, giving such attention as a person usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Gorham Mfg. Co. v. White,* 81 U.S. 511,528 (1871). The test requires that the design be viewed in its entirety and perceived by an ordinary observer familiar with the prior art. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008).

113.   I understand that the claimed areas in a design patent are indicated in the drawings with solid lines and broken or dash lines in the design patent drawings can indicate limits on the claimed design and/or unclaimed features which form no part of the claimed design.

| DEFINITION OF LINES USED IN PATENT DRAWINGS | |
|---|---|
| | A continuous thick line used to define the visual edge of a volume claimed in the patent. |
| | A broken line describes the claimed environmental structure not part of the claimed invention. |
| | A broken line consisting of alternating long and short lines indicates a centerline of a structure. "Views must not be connected by projection lines and must not contain center lines." |
| | A series of thin lines parallel and equally spaced from each other indicates a flat surface. |
| | A series of thin lines parallel to each other with graduated spacing indicates a curved surface. |

| | |
|---|---|
|  | A series of thin lines placed diagonally indicates a transparent surface. |
|  | Stippling is used for shading to indicate a textured material and/or to indicate a contrast in color and/or material. |
| | The absence of a line indicates no structure or feature is claimed. |

114.   I understand that a design patent claims and protects the ornamental design for an article of manufacture.  A design patent may protect the overall configuration or shape of an article of manufacture, an ornamental design applied to an article, or a combination of both.

115.   It is my understanding that a design patent includes a single claim that defines the patented design in the form of drawings.  I further understand that an issued design patent is presumed to be valid.

116.   I understand that the Court has not conducted a claim construction hearing or issued a claim construction in this case.  I reserve the right to supplement this report if and when the Court does so.

117.   The '941 Patent claims a portion of a footwear upper.  Applying the claim drawing practices discussed above, the figure drawing illustrations in the '941 Patent show that a portion of the inside and outside of the footwear upper and midsole are claimed.  The illustrator has made multiple clearly defined vamp lines and slingback strap around the heel are claimed.  The stippling indicates textured material and/or a contrast in material:



FIG. 1

118.    It is my opinion that the UGG® Fluff Yeah Slide is a commercial embodiment of the '941 Patent; that is, an ordinary observer would find the design claimed in the '941 Patent and the UGG® Fluff Yeah Slide to be substantially the same. In the UGG® Fluff Yeah Slide embodiment, the textured material and/or a contrast in material indicated on the '941 Patent is accomplished in manufacturing through the use of genuine sheepskin, with the fleece side on the outside of the slide:



| '941 Patent | UGG® Fluff Yeah Slide (source: UGG.com) |
|---|---|

FIG. 2

| '941 Patent | UGG® Fluff Yeah Slide (source: UGG.com) |
|---|---|



FIG. 3



FIG. 4



FIG. 5



FIG. 6

119.  It is my opinion that an ordinary observer would find the design claimed in the '941 Patent and the Kendall + Kylie Shani Slipper are substantially the same. Both feature similar clearly defined multiple vamp lines, a slingback strap that wraps around the heel, and feature textured material.  As discussed above in detail, the textured material is accomplished through the use of shiny and cheap faux synthetic fur:

| '941 Patent | Kendall + Kylie Shani Slipper |
| --- | --- |
|   FIG. 2 |  |
|   FIG. 3 |  |
|   FIG. 4 |  |



120.    It is revealing that Walmart has managed to closely copy the UGG® Fluff Yeah Slide —a commercial embodiment of the '941 Patent—using drastically different and much less expensive materials, such as using shiny and poor quality faux synthetic fur instead of genuine sheepskin.  This strongly suggests to me that the ultimate "look" of the UGG® Fluff Yeah Slide was purposeful, and for wholly aesthetic, and not functional reasons.

1    **IX.    WALMART'S PRODUCTS HAVE HARMED DECKERS AND ITS**
2    **BRANDS**

3
4
5
6
7
8
9
10
11
12
13
14

15
16
17
18
19
20
21
22
23
24
25

26    121.   In this final section, I address how the Kendall + Kylie Shani Slipper, as
27    well as Walmart's sales and promotion of such products have harmed Deckers, its
28    valuable UGG® brand, and the goodwill it has generated over decades.

122. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

123.   Tellingly, another interesting aspect of the request to note, is that the author of this email is requesting "████████████████████████████████████████████ ████" Clearly, this can be interpreted as a request to develop the product at a low price. Further in the email, there is a reference to ██████████████████ These sharp price points on look-a-like products are contrary to the high-quality products being offered by Deckers'. It diminishes the value of well-made high-quality styles in genuine sheepskin such as the Fluff Yeah Trade Dress.

124.   A competitor's use of a trade dress that is identical or confusingly similar to a company's trade dress can cause lost sales and reputation.

125.   But the harm Walmart has caused goes far beyond lost sales; it threatens the strength and health of Deckers' valuable brands. When I use the word "brand" or "brand image," I mean the consumer's idea of the product or service. This idea in the mind of the consumer is informed by everything the consumer knows about the product or service and all of her experiences with it, whether positive or negative. For example, one consumer might associate Starbucks coffee with value, quality, and convenience based on all of her interactions with Starbucks, including her own experiences, word of mouth, news stories, and advertising.

126.   Brand images change, obviously. In the above example, if Starbucks raised their prices, the above consumer might stop associating the brand with value. If the consumer buys a Starbucks coffee and it tastes bad, or if she walks into a store and finds it to be dirty or disheveled, she might stop associating the brand with quality. She may stop associating Starbucks with convenience if she has to wait in long lines to purchase coffee. And she may read a critical news article about one of Starbucks' business practices and begin to associate Starbucks with unfair or harmful business practices.

127.   With the above examples, Starbucks can control its brand image by

addressing these problems.  For example, it can protect against its brand image being associated with inconvenience by implementing procedures to reduce long waits.  It can protect against a negative quality association by implementing quality control procedures.  And it can protect against an association with unfair and harmful business practices by changing those practices.

128.    Brand images go far beyond fundamental qualities like quality and value. Particularly in the world of footwear and apparel, consumers often come to associate brands with more abstract ideas, like high performance, sophistication, brand partnerships and collaborations, ruggedness, adventurousness, authenticity, environmental responsibility, open-mindedness, and inclusivity.   More recently, sustainable sourcing practices and ethical manufacturing have also become critical conversations among both brands and consumers.   Brands like Allbirds and Veja have moved the conversation forward with many brands embracing the path toward full transparency in manufacturing.  Local manufacturing has also become important.  I had the opportunity to speak in February 2020 at two conferences, Sourcing at MAGIC and PI Apparel, and then again November and December of 2021, where I was a panelist and presented as a speaker on the benefits of sustainable sourcing and local manufacturing.

129.    The cultivation of these associations has become both an art form and a business of its own.  Companies use a wide variety of tools, including advertising, merchandising, and sponsorship, to cultivate a specific brand image, and they spend millions of dollars to do so.   Brand images can be extremely valuable because consumers often develop strong emotional relationships with a brand.  They may see a brand as a way to communicate to the world that they care about the same values the brand is associated with.  They may become personal advocates for their favorite brands by discussing them in person or on social media.  One end result of a strong positive brand image, is the ability to avoid commodification and attract customers at a higher price point, and be considered an aspirational brand, more so than their competitors.

130.   It should be obvious that a company's ability to control its brand image is harmed if others in the marketplace are using the confusingly similar trade dress or trademarks.  When a competitor uses a company's source identifier, it affects the "story" the consumer receives, and therefore affects the brand image for that consumer.  Using the above Starbucks example, if a competing company began selling low-quality coffee in a store that utilizes Starbucks' green-and-black trade dress, Starbucks, consumers might code their experiences with that coffee as experiences with Starbucks, affecting Starbucks' brand image.  No amount of quality control measures on Starbucks' part will remedy this harm – in other words, such activity takes the control of a company's brand image out of its own hands.

131.   Deckers' UGG® brand has a very specific brand image due to years of brand stewardship and dedication to understanding their customer base on the part of Deckers, as demonstrated in the following slide presentation[18] Deckers provided to its investors in 2014 and many like it:

---

[18] Deckers, *April 2014 Investor Presentation*, http://ir.deckers.com/Cache/IRCache/2319f959-cdc8-f736-58e3-0512b8a140f2.PDF?O=PDF&T=&Y=&D=&FID=2319f959-cdc8-f736-58e3-0512b8a140f2&iid=4391531

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

## KEYS TO OUR SUCCESS

PEOPLE + BRAND + PRODUCT

- Unique culture of very creative and engaged people who work collaboratively to design and develop highly authentic footwear
- History of developing niche footwear brands into lifestyle market leaders
- Unconventional and distinct styles combined with quality materials have attracted loyal consumer following

4



17

18    132.    Walmart's continued sale of the Accused Products threatens an image that
19    has been so carefully cultivated in many ways, and it jeopardizes Deckers' significant
20    investment of resources in developing these brands.  In 2021, the total valuation of
21    Deckers' IP assets and intangible goodwill associated with such IP was $55,935,000.[19]

22    133.    Walmart's activities frustrate Deckers' brands' association with quality.  I
23    personally inspected both the Accused and the Asserted Trade Dress and found that the
24    Accused Kendall + Kylie Shani Slipper is made of cheap faux fur synthetic versus
25    higher quality and longer lasting non synthetics.  Alternatively, the Asserted UGG®

26
27
28
---
[19] Deckers Brands, *2021 Annual Report*,
https://s25.q4cdn.com/376120126/files/doc_financials/2021/ar/DECK-2021-Annual-Report.pdf

Fluff Yeah Trade Dress is manufactured using high quality genuine sheepskin with natural fleece. The seams are internally reinforced, speaking to superior workmanship. Customer reviews confirm the high level and difference in quality and positive consumer perception. It takes many years to build a strong sense of goodwill as a brand, but it only takes a few bad consumer experiences, product reviews, or association with poor quality products to tear it down. Based on my over thirty-five (35) years of experience in footwear, a few bad reviews, comments about poor quality and cheap products can do just that in a matter of weeks and be detrimental to brand perception.

134. But perhaps most importantly, Walmart's continued infringement simply takes the control of these valuable brands out of Deckers' hands, denying Deckers' ability to carefully sculpt the UGG® brand images into brands consumers identify with and admire.

135. Based on the above analysis, it is my opinion that Deckers' UGG® brand has achieved substantial goodwill in the marketplace, however, the harmful infringing activities of Defendant in using the brand-identifying UGG® Fluff Yeah Slide design, has caused substantial damage to the UGG® brand.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and was executed in _Mill Valley_____, California this _11_ th day of February 2022.

# EXHIBIT A

Caroline de Baere

**Biography and Resume**

Caroline de Baëre is a fashion industry veteran with an amazing storytelling ability ranging from design and strategic product and lifecycle growth management, material development, sustainability, sourcing and cost negotiation.  Her broad range of expertise provides leadership to multiple brands while researching and developing compelling products to engage consumers. She consistently merchandises programs in-line with current market trends to achieve precise business objectives.

Expertise includes speaking engagements and presentations on panels at conferences as well as podcasts interviews and guest lectures covering all facets of business and leadership in footwear and accessories design, teaching and sustainability. Caroline has written articles and presented at conferences about local sourcing and manufacturing.

Late 2018 Caroline co-founded a women's fashion footwear and accessory brand, the BENDY by Ashbury Skies, manufactured in her home state of California. This new collection and product story focuses on ethically manufactured and sustainable sourcing practices to reduce fashion's carbon footprint.

Caroline currently holds a faculty role at California College of the Arts as a Footwear design instructor to 3rd & 4th year Fashion and Industrial design students teaching all aspects of footwear design research, sustainability, inspiration and seasonal theme and storyboards through design, development, merchandising and finally, physical 3D models of footwear collections. Caroline instructs students on understanding how Intellectual Property impacts original conceptualization.

Caroline extensive experience in has resulted in providing expert services in the footwear and accessories industry, drafting reports, providing successful outcomes in trial and deposition testimony, as well as working on design patent, utility patent, trademark and trade dress litigation.

Caroline's career includes 15 years in the corporate arena.  In 1986 she joined Esprit's Footwear and Accessories Production area.  She moved into design in 1989 as assistant to the Design Director, simultaneously studying at San Francisco's Academy of Art.  In 1992, Caroline joined LA Gear as Director of Product Development, leading the product development team through several years of consistent growth.  Three years later, she became Director of Product Development for Ariat and spent 5 years developing Western and English product collections and managing freelance designers.  In 2013 Caroline took on a Vice President role with a start-up to manage strategic planning, product implementation, sales management and merchandising.

As founder of Laforma, Caroline spent 20 years as a strategic product design consultant developing long-term relationships with accessory and footwear fashion industry leaders by offering customized product services for Men, Women and Children.  She has led multiple brands to analyze business, identify marketplace strategies and lead the implementation of original concepts and product through design, development and sourcing to take full advantage of critical business opportunities.

Caroline is able to manage a team, lead design and develop margin building collections that capture and increase market share. She is an expert at calendar adherence and sku management.  Her approach offers a unique combination of creative management skills and strategic business acumen.  These qualities, along with her relationship and team-building skills are reasons brands often work with Caroline season after season.

December 2021     p 1/5

## Caroline de Baere

**Professional Accessory & Footwear Industry Speaking Engagements and Articles**
Published Articles: https://medium.com/@debaere94941

| | |
|---|---|
| Shoe-In Podcast Episode #185: (Footwear Distributors & Retailers of America) | November 2019 |
| FDRA Footwear Design Summit: Panelist | November 2019 |
| FOOTWEAR INSIGHT: Podcast Episode #142 | January 2020 |
| MAGIC @ FN Platform: Sourcing Journal Event Panelist | February 2020 |
| PI Apparel 2020 Conference: Speaker and Focus Group Presenter | February 2020 |
| San Francisco Sustainable Fashion Week International: Speaker | April, 2020 |
| FDRA Shoe Sustainability Summit: Moderator – 4 Industry Leader Conversations | July 2020 |
| PI Apparel 2020 Conference: Intellectual Property Focus Group Presenter | November 2020 |
| PI Apparel Spotlight on Data and Merchandising: Moderator of two panels | March 2021 |
| FDRA Intellectual Property Summit: Panelist | April 2021 |
| PI Apparel Spotlight on Sustainability: Moderator | September 2021 |
| FIT (Fashion Institute of Technology, New York): Speaker on Intellectual Property | October 2021 |
| CCA (California College of the Arts, SF): Speaker on Intellectual Property | October, 2021 |
| Polymers in Footwear Virtual Summit: Panelist | October 2021 |
| Polymers in Footwear Virtual Summit: Speaker on Local Manufacturing | October 2021 |
| Millinery Meetup: Speaker on Intellectual Property | October, 2021 |
| Footwear Innovation Summit, China: Topic – Speaker on Sustainability | November 2021 |
| Footwear Innovation Summit, New York: Panelist | December 2021 |

**Teaching Faculty: Adjunct Professor**
CALIFORNIA COLLEGE OF THE ARTS:      2019 – present
- o  Footwear design instruction and critiques; 3rd & 4th year Fashion / Industrial design students.
- o  Guidance includes teaching all aspects of design conceptualization, research and theme development, sketching and creating physical footwear prototypes.
- o  Advisor and internship coordination for industrial design students.

December 2021    p 2/5

## Caroline de Baere

**FOOTWEAR & ACCESSORY INDUSTRY EXPERT:**    2011 – present
- o  Provide trademark, design, utility & technical expert services.
- o  Sales and sell through analysis, market research and trade dress, loss of goodwill review.
- o  Experience in report writing and expert testimony for patent and trademark litigation.
- o  Clients Include Morgan, Lewis & Bockius, Oblon, McClelland, Maier & Neustadt, L.L.P., Greer Burns & Crain, Arent Fox, Holland & Knight, Goldberg Cohen LLP, Blakely Law, DLA Piper

### Expert Consulting Experience
LAFORMA, INC:        2000 – present
Client List includes:
- o  Men's and Women's Footwear: Ariat International, Teva, Sperry Top-Sider, Birkenstock, Vasyli, Keen, Red Wing, Dunham, Goodsoles, Sebago, Dr. Andrew Weil, KangaRoos, OluKai, Ex-Officio, Hush Puppies, Hoof & Woof
- o  Children's: Livie & Luca, UMI Children's, Lelli Kelly, pediped, Stride Rite Corp, Atsco Group
- o  Accessories: Brighton, Troxel Helmets, Vinaferro, LeatherBay

Founder; Laforma, Inc. Footwear and Accessories Industry Consultancy
- o  Identify and create stories and product briefs guided by market needs and competition.
- o  Advise on sustainable sourcing and manufacturing alternatives to reduce carbon footprint.
- o  Consult clients on innovative concepts, product development and implementation sourcing strategies.  Develop detailed prototype specifications packages with sourcing partners; including extensive technical pattern work on Casual, Dress and Sport products.
- o  Manage and provide creative direction to design and development staff in order to present seasonal collections for as many as 7 clients at a time.
- o  Trend and material research presentations to motivate design and product development
- o  Negotiate and confirm detailed product costing with factories and agents overseas.
- o  Provide fit and wear test training services and execute effective processes for improvement.
- o  Develop color and material palettes in-line with seasonal trends and market needs.
- o  Facilitate and lead executive level project management, strategy and merchandising brainstorm sessions to identify and analyze future business opportunities.
- o  Develop product plans using industry competitive and trend analysis with the objective of maximize sales potential and achieve product portfolio optimization.
- o  Manage strategic planning and merchandising process with key clients to actively brief and introduce product collections to meet consumer needs and margin requirements.
- o  Extensive global travel to Asia, Europe and South America for sourcing, prototype development, costing and product approval.  U.S. travel for design meetings, sales and product review presentations.

### Corporate Experience
PLAE, INC:      2013 – 2015
Vice President (Merchandising, Operations & Sales), Footwear
- o  Created and implemented seasonal corporate design, development, production and sales calendar followed by cross-functional teams.  Improved development lead-times 5 weeks.
- o  Managed development process from initial sketch and patterns through final production.
- o  Created and supported go-to-market strategies and merchandising for initial brand launch in the market for both Domestic and International accounts.

# Caroline de Baere

- o Managed process to create balance between seasonal, new and core products.
- o Managed and executed forecasting, production purchasing with overseas factory partners and product development of seasonal collections.
- o Developed and drove long-term planning initiatives to support growth and increase sales.
- o Vice President of Sales leading 1200% growth from 2013 launch to end 2014.
- o Recruited, trained and mentored Sales and Operations teams; 50% of the company's staff.
- o Lead channel specific product sales presentations and merchandising to strategic business partners; opening critical Domestic retail and International accounts.
- o Prepared and trained Territory Sales Managers to execute retail product tech seminars focused on increased sell through and increasing fill-in rates.

ARIAT INTERNATIONAL:        1995 – 2000
Director of Product Development and Design

- o Managed and developed as many as 8 product collections including Men's, Women's and Children's Casual, English and Western Performance and Fashion Equestrian.  Achieved exponential growth season to season.  Strong understanding of Western and English boot and accessories categories.

- o Created color palettes worked with vendors to select and merchandise leathers and trims.
- o Initiated and implemented first development specifications, tracking systems and product line development calendars during the brand's infancy,  increasing efficiencies.
- o Developed product specifications and executed detailed prototype corrections.
- o Extensively traveled to Western, English and Casual trade shows, rodeos and retailers. Seasonal product development travel to Asia, Italy and Brazil.

LA GEAR:      1992 – 1995
Director of Product Development, Women's

- o Created and managed product and technical development for Women's collections.
- o Negotiated pricing for all products to meet or exceed margin requirements.
- o Extensive travel with in-house teams for product presentations and product line reviews. Frequently presenting to anywhere from 5 to as many as 100 people.
- o Managed product development staff.
- o Travel to Asia: development cycle and prototype review.  Liaison with overseas partners.

ESPRIT:      1986 – 1992
Design Assistant, Women's and Children's        1989 – 1992

- o Assisted Design Director with design and development of all footwear collections.
- o Trend boards and research, color palette and material selection, sketching.

Production Assistant, Footwear and Accessories        1986 – 1989

- o Prototype and sales sample review, confirmation sample approval.
- o Purchase Order and Inventory analysis as well as product allocation.

## Patents held

US D785308 Boot with Notch design: 2017        US D767264 Footwear Outsole design: 2016
US D741056 Footwear Outsole design: 2015        US D398438 Footwear Boot w/ Zipper design: 1998

Caroline de Baere

**Community Involvement**
FDRA (Footwear Distributors & Retailers Association):    2019 – present
Sustainability Working Group – active member in brainstorming and leading industry change.

TWO-TEN Footwear Foundation:    2016 – present
National Committee Member & Volunteer
Contribute and manage planning of West Coast events and Footwear Cares Volunteer efforts.
Mentor Program Volunteer providing mentorship to a young woman within the footwear industry.

MARIN PARENTS OF MULTIPLES CLUB:        2010 – 2014
Volunteer Coordinator        2011 – 2014
Committee member leading volunteer effort 4 years to manage 135 people over 3 days for the
club's annual fundraiser.
Board of Directors    2010 – 2012
Mom's Night Out: Planned monthly activities for 2 years achieving highest turnout in club's history.

**Education**
Bachelor of Science, International Business     Sacramento State University, California
Design Course Study                                      Academy of Art, San Francisco, California
Leather Industries of America – leather making  Leather Industries of America, Washington, DC

**Professional Organizations**
TWO-TEN Footwear Foundation & Women in Footwear Industry        Waltham, Massachusetts

# EXHIBIT B

l a f o r m a                                        C a r o l i n e d e B a e r e

**RELEVANT FASHION & FOOTWEAR INDUSTRY CASE EXPERIENCE**

Testimony:       3 trials in Federal Court, 4 depositions (live & virtual) 1 Markman hearing
Reports:         over 13 Reports, Declarations and Affidavits
Total 16 cases:  8 cases – Plaintiff  &  8 cases – Defendant

1.    ROTHY'S Inc. V. Birdies, Inc.
      Expert: Plaintiff's attorney – Arent Fox
      Document review and research
      Case ongoing

2.    DECKERS OUTDOOR CORPORATION, Plaintiff V. Ego Shoes Limited
      Expert: Plaintiff's attorney – Blakely Law Group
      1 Declaration: *Design Patent, Trade Dress*
      Case ongoing

3.    Italian Shoemakers, Inc V. Maurico Marroquin
      Expert: Defendants' attorney – Givner Law
      1 Deposition, 1 Affidavit, Document Review and Opinion: *Trade Secrets*
      Case ongoing

4.    Kate Spade, LLC, Plaintiff V. Nima Niknejad
      Expert: Defendants' attorney – Slater Law
      1 Expert Report: *Trademark*
      Case ongoing

5.    Skechers USA, Inc., Plaintiff V. Golden Goose S.P.A.
      Expert: Defendants' attorney – Fross, Zelnick, Lehrman & Zissu
      1 Expert Report: *Trademark*
      Case ongoing

6.    AirWair International Limited, Plaintiff V. ITX USA, LLC
      Expert: Defendants' attorney – Arent Fox
      Trial Testimony, 1 Expert Report, 1 Virtual Deposition: *Trademark, Trade Dress*
      Case closed August, 2021

7.    DECKERS OUTDOOR CORPORATION, Plaintiff V. Target Corporation
      Sanuk brand
      Expert: Plaintiff's attorney – Blakely Law Group
      1 Expert Report: *Trade Dress*
      Case closed July, 2020

8.    DECKERS OUTDOOR CORPORATION, Plaintiff V. Target Corporation
      UGG & Sanuk brands
      Expert: Plaintiff's attorney – Blakely Law Group
      1 Virtual Deposition, 1 Expert Report: *Design Patent, Trade Dress*
      Case closed July, 2020

laforma                                    C a r o l i n e d e B a e r e

## RELEVANT FASHION & FOOTWEAR INDUSTRY CASE EXPERIENCE: CONTINUED

9.    JEZIGN LICENSING, LLC, Plaintiff, V. NIKE, INC., Defendant
      Expert: Defendants' attorney – DLA Piper (initially Wilmer Hale)
      *Document review*
      Case settled January, 2020

10.   Reebok International Ltd. and Reebok International Limited. V. TRB Acquisitions LLC, RBX.Com LLC,
      RBX Direct LLC, and Elite Performance Footwear LLC
      Expert: Defendants' attorney – Arent Fox
      Product and Document review: *Distribution Agreement*
      Case settled December, 2019

11.   Buyer's Direct, Inc, Plaintiff V. JY Designs and Creations, Inc.
      Expert: Plaintiff's attorney – Oblon, McClelland, Maier & Neustadt, LLP.
      Declaration: *Design Patent*
      Case settled June, 2019

12.   DECKERS OUTDOOR CORPORATION, Plaintiff V. AUSTRALIAN LEATHER PTY LTD and ADNAN OYGUR
      a/k/a EDDIE OYGUR, Defendants
      Expert: Plaintiff's attorney – Greer, Burns & Crain
      Deposition, 2 Expert Reports: *Design Patent*
      Defendants stipulated prior to trial; Plaintiff's Patents-in-Suit were valid and infringed.
      Trial May, 2019

13.   Gavrieli, LLC, Plaintiff V. Soto Massini Corp, Soto Massini S.R.L.S. and Thomas Pichler, Defendants
      Expert: Plaintiff's attorney – Morgan Lewis & Bockius
      Trial Testimony, 1 Expert report, Research: *Design Patent, Trade Dress*
      Trial April/May, 2019

14.   JOHN WAYNE ENTERPRISES, LLC, Plaintiff V. LUCCHESE, INC.; SURPLUS DISTRIBUTORS, dba
      COUNTRY GENERAL STORE; and DOES 1 through 10, Defendants
      Expert: Defendants' attorney – Holland & Knight
      Draft report, Document review, Extensive Research over 12 months Case settled May, 2019

15.   DECKERS OUTDOOR CORPORATION, Plaintiff V. ROMEO & JULIETTE, INC. a California Corporation; and
      THOMAS ROMEO, an individual, and DOES 1-10, inclusive, Defendants
      Expert: Plaintiff's attorney – Blakely Law Group
      Trial Testimony, 1 Expert Report: *Design Patent*
      Trial April, 2018

16.   Piggy Pushers, LLC, Plaintiff V. Skidders Footwear, Inc., Defendants
      Expert: Defendants' attorney – Goldberg Cohen LLP
      1 Markman Hearing, 1 Expert Report: *Utility Patent*
      Case settled

# EXHIBIT C

| | MATERIALS CONSIDERED |
|---|---|
| 1 | Deckers' Complaint filed October 16, 2020, Dkt. No. 1 |
| 2 | Walmart's Answer to Deckers' Complaint filed January 25, 2021, Dkt. No. 20 |
| 3 | U.S. Patent No. D866,941 |
| 4 | Deckers' August 9, 2021 Responses to Walmart's Interrogatories |
| 5 | UGG DTC Consumer Profile, March 2021, DOC 001786-DOC 001844 (05-UGG DTC Consumer Profile March 2021.pdf) |
| 6 | Converse, *Chuck Taylor All Star*, https://www.converse.com/shop/p/chuck-taylor-all-star-unisex-low-top-shoe/M9166.html?dwvar_M9166_color=black&styleNo=M9166&cgid=mens-classic-chuck-shoes |
| 7 | Adidas, *Stan Smith Shoes*, https://www.adidas.com/us/stan-smith-shoes/B24105.html |
| 8 | Coco Chanel, *Mini Flap Bag With Top Handle*, https://www.chanel.com/us/fashion/p/AS2431B07674NH297/mini-flap-bag-with-top-handle-lambskin-gold-tone-metal/ |
| 9 | Fluff Yeah Sales, DOC002601 (09-Fluff Yeah Sales.xlsx) |
| 10 | Deckers Fluff US Spend, DOC 002559 (10-Fluff US Spend.xlsx) |
| 11 | AW18 Fluff Power Directive, DOC 002247-DOC 002270 |
| 12 | AW19 Transition Directive Drop Two, DOC 001875-DOC 001963 |
| 13 | YouTube, FEEL LOVE with LaRayia Gaston, https://www.youtube.com/watch?v=rBnSd0-avdM |
| 14 | YouTube, UGG Holiday 2021, "The Perfect Teen Gift", https://www.youtube.com/watch?v=IviF9sqU99s |
| 15 | Expert Report of Matthew G. Ezell, *Deckers Outdoor Corporation v. Wal-Mart Store, Inc.*; C.D. Cal. Case No. 20-cv-09521, Dated February 11, 2022 |
| 16 | Addison Rae Fluff Yeah, DOC 001757; Brie Larson Fluff Yeah, DOC 000225; and Megan Fox Fluff Yeah, DOC 001069 |
| 17 | Sofia Richie in the UGG® Fluff Yeah Slides, @sofiarichie Instagram Stories DOC 000234; Chantel Jeffries wearing UGG® Fluff Yeah Slides, @chanteljeffries Instagram Stories, DOC 000397 |
| 18 | BuzzFeed, *28 Comfortable Pairs of Shoes the BuzzFeed Shopping Team Swears By*, DOC 001554 |
| 19 | ET, *Celeb-Approved Mother's Day Gift Ideas*, DOC 001573 |

| | MATERIALS CONSIDERED |
|---|---|
| 20 | Fluff Yeah Cust Reviews, DOC 002560 |
| 21 | Style Caster, *These Are The Best UGG Fluff Yeah Slipper Dupes We've Seen - & they're Only $20*, February 5, 2021 (https://stylecaster.com/ugg-fluff-yeah-slipper-dupes/) |
| 22 | Deckers Fluff Yeah Cases, DOC 002603 |
| 23 | *Deckers Outdoor Corporation v. Ego Shoes Limited;* C.D. Cal. Case No. 2:20-cv-11351 |
| 24 | *Deckers Outdoor Corporation v. Lorlie Investment Group Corp. et al.*, Case No. 2:20-cv-07566 |
| 25 | *Deckers Outdoor Corporation v. Fashion Nova, Inc. et al.*, Case No. 2:20-cv-07565 |
| 26 | *Deckers Outdoor Corporation v. Legend Footwear, Inc. et al.*, Case No. 2:20-cv-08632 |
| 27 | *Deckers Outdoor Corporation v. Lola & Soto Business Group, Inc. et al.*, Case No. 2:20-cv-07569 |
| 28 | December 17, 2019 – January 7, 2020 Emails between Samantha Sandone and Greg Nicoghosian and Kerri Jackson, WM-DECKERS0000056 - WM-DECKERS0000058; K+K Slipper Inspo.pptx, WM-DECKERS0000059 |
| 29 | Deckers, April 2014 Investor Presentation, http://ir.deckers.com/Cache/IRCache/2319f959-cdc8-f736-58e3-0512b8a140f2.PDF?O=PDF&T=&Y=&D=&FID=2319f959-cdc8-f736-58e3-0512b8a140f2&iid=4391531 |
| 30 | Deckers Brands, 2021 Annual Report, https://s25.q4cdn.com/376120126/files/doc_financials/2021/ar/DECK-2021-Annual-Report.pdf |

# EXHIBIT D

| Deckers Fluff Yeah Cases | |
|---|---|
| Deckers Outdoor Corporation | Bebe Stores, Inc. (2021) |
| Deckers Outdoor Corporation | Ego Shoes Limited (2020) |
| Deckers Outdoor Corporation | Five Below, Inc. (2020 ) |
| Deckers Outdoor Corporation | Kimera International (2021) |
| Deckers Outdoor Corporation | Lorlie Investment Group (2020) |
| Deckers Outdoor Corporation | Public Desire (2020) |
| Deckers Outdoor Corporation | Walmart (2020) |
| Deckers Outdoor Corporation | Fashion Nova Inc. (2020) |
| Deckers Outdoor Corporation | Gap (2021) |
| Deckers Outdoor Corporation | Legend Footwear Inc. (2020) |
| Deckers Outdoor Corporation | Lola & Soto Business Group (2020) |
| Deckers Outdoor Corporation | Lucy Avenue (2020) |
| Deckers Outdoor Corporation | Shoetopia, Inc. (2020) |
| Deckers Outdoor Corporation | Steve Madden (2020) |
| Deckers Outdoor Corporation | Fashion Marketing & Merchandising (2020) |

DOC 002603

# EXHIBIT 2

| '941 Patent | UGG® Fluff Yeah Slide (source: UGG.com) |



FIG. 2





FIG. 3







FIG. 4



| '941 Patent | UGG® Fluff Yeah Slide (source: UGG.com) |
|---|---|



FIG. 5





FIG. 6

