# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DECKERS OUTDOOR CORPORATION, a Delaware Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>WALMART INC.; and DOES 1-10, inclusive<br><br>Defendants. | Case No. 2:20-cv-09521 FLA-E<br><br>**SECOND DECLARATION OF LENNY M. HOLDEN IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Hon. Fernando L. Aenlle-Rocha** |

I, Lenny M. Holden hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I submit this Second Declaration to accompany the Reply submitted in support of the Motion for Summary Judgment ("Motion") filed by Defendant, Walmart, Inc. ("Defendant" or "Walmart") in this action. If called upon as a witness, I am able to testify as to all facts, opinions and matters addressed in this Declaration, based upon my professional experience, personal knowledge and/or review of the pertinent materials and information contained in and exhibited to this Second Declaration.

2. **Background**: As stated in my first Declaration [ECF No. 54-6, ¶ 2] ("First Declaration") submitted in support of the Motion, I am a footwear expert, not an attorney and specialize currently conducting expert studies and analyses in multiple types of litigation regarding patents, trademarks, product quality issues, contractual services, and product liability. Although I am familiar with the legal

concepts and standards involved with patents and trade dress generally, my principal focus and task, including the analyses and opinions performed in this case, is to study the substance of the respective footwear designs, such as the design depicted in the '941 Design Patent at issue, in comparison to products sold and publicly known before the filing date of the subject patent, otherwise referred to in legal terms as "prior art".

3. In both my initial Expert Report, dated February 10, 2022 ("Initial Report") and First Declaration, dated February 21, 2022, I made the very same qualitative analysis and proffered the same professional opinions as a footwear designer skilled in the footwear art regarding the uniqueness or lack thereof of the sandal design shown in the '941 Design Patent when compared to the prior art. In both documents (as further detailed in the Exhibit 4 to both) I reached the opinion that the '941 Design Patent was not entitled to exclusive patent protection, because is was not new and/or was obvious. The fact that I may not have used specific legal terminology such as "obvious" (which I dispute per the discussion below) or other specific legal terminology in my Initial Report, had no effect on the overall substance of my analysis or opinions rendered. I prepare my reports using plain language and in this case, where there were so many examples of clear prior art, this certainly reinforces the argument that the '941 Patent should not be upheld as valid because it is not new and is at least obvious to a footwear designer skilled in the art.

4. **Initial Report** – In ¶¶ 5 and 6 of my Initial Report [ECF No. 64-34] I reviewed in my judgment the 4 closest prior art references presented to me from the GLS search agent's report (Ex 3 to my Initial Report and to my First Declaration) and performed a side-by-side detailed analysis between each of those items of prior art when compared to the "claims" (drawings) of the '941 Design Patent. This qualitative comparison is best depicted in Exhibit 4 to my Initial Report, but is also described further in the written text at ¶¶ 6.1-6.2 and sub-paragraphs with respect to each item of prior art. In fact all of the main features of the sandal design depicted in the '941 Design Patent, namely: 1) a fluffy/textured 4-ribbed vamp, 2) a platform midsole and a 3) backstrap are all clearly and without question shown in the comparison that I made in Exhibit 4, in relation to the prior art and that little or no additional analysis is needed for a person skilled in footwear design to compare them or reach conclusions about their similarity.

5. As further stated in those paragraphs, the only noticeable differences that I mention related to the lower sidewall portion of the midsole shown with a textured (fluffy) covering in the '941 Patent, as compared to prior art midsoles, some of which had exposed rubber portions at the bottom sidewall portion of the midsole. In fact I specifically concluded that in my professional opinion such differences were "commonplace" variations and in reference to what is the closest prior art sandal (the Rasolli-Jhatnna sandal): "any variations represent merely commonplace and ***obvious*** design choices for this type of fluffy looking

sandal." Initial Report at ¶¶ 6.2.1 (emphasis added).

6. **First Declaration-** I made the very same qualitative analysis between the '941 Design Patent and the prior art and reached the same conclusions in my First Declaration (ECF 54-6,¶¶7.1- 7.5 and sub-paragraphs) submitted in support of the Motion [ECF 54]. In fact, I used the same detailed side-by-side comparison by reference to the same substantive demonstrative exhibit, Ex. 4 [ECF 54-11] to reach my opinions. The substance of Exhibit 4, attached to both my Initial Report and in my First Declaration, by directly comparing the drawings of the '941 Design Patent with the prior art images would be abundantly clear in that a skilled footwear designer would recognize the obviousness of the minor differences between the prior art and the '941 Design Patent.

7. **Further Discussion of Prior Art and Invalidity Opinions as to the '941 Design Patent-** I have been asked to clarify the conclusions that I made in my First Declaration (and Initial Report), in light of arguments made by Plaintiff that I did not reach a proper conclusion as to invalidity of the '941 Design Patent by way of a specific "obviousness" analysis as required by the law applicable to design patents. Opp. at pp. 12-14 [ECF 64]. As indicated above, I am primarily a footwear design and construction expert and not an attorney. I rely on counsel for the party by whom I am engaged to apply the specific legal principles to the substance of my prior art analysis and opinions in my expert reports. However, I am aware of the general legal concepts relevant to the validity of design patents

in preparing my reports, even though I do not specifically recite the specific legal principles in my reports.

8. However in order to clarify my analysis and opinions, counsel for Defendant has recited to me the legal requirements in order for a design patent to be valid, namely that it must be: "(1) new, (2) original, (3) ornamental, (4) nonobvious to a person of ordinary skill in the art, and (5) not primarily for the purpose of serving a functional or utilitarian purpose."

9. In reevaluating my analysis based on the comparisons made in my First Declaration, in particular with reference to Ex. 4, I can confirm that the focus of my analysis was primarily on requirements (1) and (4) and to some extent (5), as to whether or not the '941 Design Patent was "new" that is whether it was "novel" and/or "nonobvious to a person of ordinary skill in the art".

10. However, upon seeing the '941 Patent, my initial impression was that since the "design" related exclusively to the shape of a sandal (or classic mule) that utilized textured or fluffy material, I was surprised that it was granted over factor (5) as in my view the sandal configuration was "primarily for the purpose of serving a functional or utilitarian purpose", that is a fluffy/plush sandal shape utilizing a blackstrap, a product type that has been in the marketplace for decades.

11. After reviewing the numerous prior art examples found from the GLS search report, Ex. 3 to my First Declaration (ECF 54-9], my suspicions were firmly

-5-
**SECOND DECLARATION OF L. HOLDEN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

confirmed, because to me these prior art references virtually obliterated any possible scope of design patent rights.

12. In this regard, in my view one particular example found, the **Rasolli-Jhatnna** sandal publicly sold/published as early as April 2014, more than 4 years before the Filing Date of the '941 Design Patent, has virtually identical features compared to those in the '941 Design Patent. As I concluded in my First Declaration at ¶ 7.5.1 [ECF 54-6 at 7], (with reference to Ex. 4 [ECF 54-11]) the features of this sandal have a "very similar fluffy 4-ribbed vamp, high platform midsole and backstrap when compared to the drawings of the '941 Design Patent."

13. In reevaluating the **Rasolli-Jhatnna** prior art reference specifically (See, Ex. 4, p.2, 2nd Image [ECF 54-11 at 3]), this product comes very close to being what I consider to be a "knock-out" reference, that is rendering a patented design lacking in novelty (ie. factor (1), it is not "new" or lacks "novelty"). Here all of the main features are present, including midsole sidewall portions having a textured or fluffy ornamental appearance, the same as shown in the '941 Design Patent. On the basis of this reference alone, in my opinion the '941 Design Patent completely lacks novelty. As Defendant's counsel has informed me, the legal term for such a reference is also called an "anticipation" or "anticipatory prior art".

14. I have also researched the source of the **Rasolli-Jhatnna** prior art reference and

found that Rasolli is a currently viable shoe company based in New York, NY. Attached as **Ex. A** is a true and correct copy of the Rasolli "about us" and "contact us" pages from the company website. In addition the **Rasolli-Jhatnna** prior art product found in the GLS search report also still appears on the Rasolli website and is offered for sale. Attached as **Ex. B** is a true and correct copy showing an image of the same Jhatnna sandal offered on the current Rasolli website. I also noted that the 2014 copyright notice shown at the bottom of the Rasolli online product page (Ex. B) corroborates the April 2014 Rasolli website offer date of the same product from the GLS search result [ECF 54-9 at 5].

15. I have also been able to transact a purchase of the **Rasolli-Jhatnna** prior art sandal from the Rasolli website on March 14, 2022. Attached as **Ex. C** is a true and correct copy of the purchase receipt for the **Rasolli-Jhatnna** sandal that I purchased from Rasolli. I am awaiting final determination from Rasolli as to whether an existing product is in stock for them to send to complete the purchase.

16. With respect to the additional prior art references relied on in my First Declaration, I also concluded that any variation between the '941 Patent design and the prior art "represent merely commonplace and *obvious* design differences for this type of fluffy looking sandal." First Declaration, ¶ 7.5.1-7.5.3 [ECF 54-6 at 7], (with reference to Ex. 4 [ECF 54-11]) (emphasis added).

17. I understand that my conclusions in this respect relate more specifically to the

factor (4) concept of "obviousness" as so stated above from my First Declaration (and Initial Report). I understand from Defendant's counsel that the more specific legal test for "obviousness" involves a court's factual inquiry by analyzing the *Graham* factors, set forth by the United States Supreme Court, by examining: (1) "the scope and content of the prior art"; (2) "differences between the prior art and the claims at issue"; (3) "the level of ordinary skill in the pertinent art and (4) any relevant objective secondary considerations of nonobviousness, including '[a] commercial success, [b] long felt but unsolved needs, [and] [c] failure of others....'". *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) (quoting *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)).

18. In my analyses contained in my First Declaration (and Initial Report) I primarily focused on factors (1) and (2) as evident from the content of the prior art that I considered from the GLS search report (Ex. 3) and my comparison of the prior art to the "claims" (drawings) of the '941 Design Patent. Further as someone skilled in footwear design, I also considered factor (3) from the standpoint of someone ordinarily skilled in the field of footwear design (as I always do when formulating such analyses and opinions). With regard to factor (4) or "secondary considerations" although I did not specifically weigh the so-called "commercial success" of the patented design, from my extensive

-8-
**SECOND DECLARATION OF L. HOLDEN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

experience in the footwear field, I am aware of no "long felt or unsolved need" or "failure of others" to design or make this type of, in my view common, plush sandal design. In my judgment any such "need" or "failure" would be non-existent in the marketplace.

19. Also I would like to further clarify my opinions on obviousness, where I concluded that any differences between the relevant prior art designs and the '941 Design Patent "represent merely commonplace and *obvious* design differences for this type of fluffy looking sandal." First Declaration, ¶ 7.5.1-7.5.3 [ECF 54-6 at 7], (with reference to Ex. 4 [ECF 54-11]) (emphasis added). In this regard, I would further emphasize that differences such as those shown in the **Signlinmoo Slipper** (*Id.* at 7.5.2 and Ex. 4, p. 3, 1st image) and the **Sonoma Goods for Life-Faux Fur** sandal (*Id.* at 7.5.3 and Ex. 4, p.3, 2nd image) were very minor and at most would involve only the addition of textured or fluffy material to the sidewall portions of the midsole of each design.

20. I have also been further instructed by counsel for Defendant that courts tend to undertake a two-step test, to determine obviousness by finding that (1) a primary reference exists, "the design characteristics of which are basically the same as the claimed design," and (2) reasons, such as prior art references, to modify the primary reference's design to create a design that has the same overall visual appearance as the claimed design, also exist." *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1311-12 (Fed. Cir. 2013).

21. My understanding of this exercise relates to the typical circumstance where

-9-
**SECOND DECLARATION OF L. HOLDEN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

only one key reference usually exists to rely on as prior art. Here in my opinion, there exist at least 3 and possibly more "primary references" that disclose each and every one of the same design features claimed in the '941 Patent product configuration (ie. The **Rasolli-Jhatnna** sandal, **Signlinmoo Slipper,** and the **Sonoma Goods for Life-Faux Fur** sandal).

22. Further, the additional showing of "reasons, such as prior art references, to modify the primary reference's design to create a design that has the same overall visual appearance as the claimed design" are also very evident in my opinion. First minor design variations, such as also covering the sidewall portions of the midsole with textured or fluffy material, from my professional knowledge and opinion would have been commonly known generally in the field of sandal or slipper design. Moreover, there are specific examples that literally reinforce the motivation for making such a design variation in one of the many prior art products yielded from the GLS search report that I relied on; one specific example was the ""Fluffy Sandals" offered on Amazon.com at least as early as May 2017. Ex. 3 to First Declaration at 14 [ECF 54-9]. This image clearly shows the use of a textured fluffy material to cover the entire midsole portion of the sandal, including the sidewall portions, a design variation that would be commonly known and available to a skilled sandal designer.

23. **The UGG-Koolaburra Sandal ("Koolaburra-Fuzzin Faux II Sandal"-** For the same substantive reasons given regarding the obviousness of the above

**SECOND DECLARATION OF L. HOLDEN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

third party prior art designs, in my First Declaration, I also concluded that the **Koolaburra-Fuzzin Faux II Sandal** product marketed and sold by Plaintiff could also be used as a very close (and possibly yet another primary) prior art reference to challenge the validity of the '941 Design Patent. See, First Declaration at ¶¶ 7 to7.4 [ECF 54-6 at p. 5-6] and Exhibit 4, p.2, 1st image [ECF 54-11]. The GLS search report yielded evidence of its availability through a Nordstrom Rack website as early as December 4, 2017. Ex. 3 to First Declaration at 6 [ECF 54-9]. A follow-up search was also performed and yielded additional information that the sandal may have been sold as early as 2014 or perhaps much earlier. Ex. 3-1 to First Declaration at 2 [ECF 54-10], (showing Nordstrom and Macy's website listings).

24. However, Plaintiff has referenced an invoice claiming that it shows the earliest sale of the Koolaburra product as January 24, 2020. Bareda Decl. at ¶ 22, Ex. 8 [ECF 64-4 at 5 & 62].

25. I have received a further follow-up search letter from GLS, confirming the existence of an UGG catalog from 2002 showing a similar type of product called the "Fluff Slide". See attached **Ex. D**, GLS March 15, 2022 letter with enclosed UGG 2002 catalog pages. Based on the GLS March 15 letter, it is my understanding that this prior product information was obtained from the USPTO and from design patent application filings by Deckers. In my opinion this appears to be an early version of the Koolaburra product, albeit not including a

-11-
**SECOND DECLARATION OF L. HOLDEN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

backstrap. This evidence tends to show in my opinion that various versions of the Koolaburra product would have been on sale and available well before 2020, corroborating the prior art examples from the original GLS searches shown in Exhs. 3 and 3-1 to my First Declaration.

26. **My March 9, 2022 Deposition**- My deposition was conducted by Plaintiff during the course of expert discovery, after my Initial Report and Rebuttal Report were disclosed to Plaintiff in compliance with the expert discovery schedule and after my First Declaration was filed with Defendant's Summary Judgment Motion. Overall, the deposition questions were intentionally confusing and in my view had very little relevance to my actual expert reports and opinions. For the most part the questions were focused on abstract matters and definitions of legal terminology that I normally do not use in the context of my expert reports and opinions as explained above. I found it odd that most of the questions tended to focus on my understanding or recollection of abstract legal definitions without any context or connection to the actual analysis and opinions expressed in my expert reports.

27. I also distinctly recall that I was never examined at all during the deposition with respect to the content or opinions rendered in my First Declaration [ECF 54-6] submitted in support of the Motion now before the Court.

28. I am also aware that Plaintiff's footwear expert Ms. De Baere, also never prepared and disclosed a rebuttal to my Initial Report, that was due to be

disclosed by Plaintiff during expert discovery by February 25, 2022 [ECF No.53]. Further Ms. De Baere's Declaration filed in support of Plaintiff's Opposition [ECF No. 64-5], also contains no analysis of the opinions within or rebuttal to my First Declaration, nor did it even address the substance of the prior art analyzed in my Initial Report and First Declaration.

29. Further, I have seen a copy of only a rough draft of my deposition transcript [ECF No. 64-37] and have not had the opportunity to carefully read the entirety of the transcript to confirm its accuracy or to correct any erroneous entries or testimony. Once I am in receipt of the certified copy of the transcript I will promptly review it carefully to make any corrections, complete the errata sheets and sign the affirmation in due course.

30. However, I understand that Plaintiff has asserted that during my deposition, that I testified to the effect that the entirety of the alleged "UGG Fluff Yeah trade dress" is non-functional. Opp. at 17 [ECF 64]. I disagree with that position and believe that Plaintiff is misinterpreting my testimony.

31. Defendant's counsel has referred me to p. 135 of the rough transcript draft [ECF 64-37 at 135, ll. 10-12] where I referred to my written rebuttal statement that "some minor aspects of the asserted Fluff Yeah Slide may be nonfunctional". It is my recollection that I meant that minor aspects such as the textured or fluffy covered midsole sidewall portions are the "minor aspects" of the UGG sandal design that may be nonfunctional and nothing else. It is my

overall view that most of the features of the UGG sandal design are primarily functional.

32. I was also referred to a later portion of the transcript from pp. 145-147 [*Id.*], which appears to be missing the entirety of the transcript content of p.146, which is blank. As a result it is hard to determine the full context of my testimony on those pages. Nonetheless, at the top of P. 147 I make the statement that: "As I stated before, in the other portion that I read, I agree that it is nonfunctional" [ECF 64-37 at 147, ll. 3-5]. My understanding that by saying "[a]s I said before in the other portion" I am referencing my testimony at p. 135 where I read the part from my rebuttal report that only "minor aspects" of the asserted trade dress were "nonfunctional" (as explained above). I was not agreeing, nor have I ever thought, that the entirety of the alleged UGG Fluff Yeah sandal design or features are entirely nonfunctional. In fact, my belief more accurately stated is that alleged trade dress in this case is non-existent and should not be the subject of legally enforceable rights.

33. In any event and as noted above, the rough transcript draft is missing an entire page of testimony and is incomplete. I will await the receipt of the certified draft before reviewing, and if necessary correcting, the transcript to accurately reflect my testimony.

I declare under penalties of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Executed this 18th day of March 2022 in Los Angeles, California.

_____
Lenny M. Holden